*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0145P (6th Cir.)
File Name: 04a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

YAYESHWORK ABAY and
BURHAN AMARE,

     *Petitioners,*

    *v.*

JOHN ASHCROFT, United
States Attorney General and
IMMIGRATION AND
NATURALIZATION SERVICE,

     *Respondents.*

No. 02-3795

On Petition for Review of an Order of the
Board of Immigration Appeals.
No. A73 401 965.

Argued: January 29, 2004

Decided and Filed: May 19, 2004

Before: MERRITT and SUTTON, Circuit Judges;
FEIKENS, District Judge.[*]

---

[*] The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioners. Julia K. Doig, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioners. Nancy E. Friedman, Richard M. Evans, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

MERRITT, J., delivered the opinion of the court, in which FEIKENS, D. J., joined. SUTTON, J. (pp. 16-21), delivered a separate opinion concurring in the judgment.

---

## OPINION

---

MERRITT, Circuit Judge. Yayeshwork Abay and her minor daughter Burhan Amare, citizens and natives of Ethiopia, petition the Court for review of an order in which the Board of Immigration Appeals affirmed without opinion the immigration judge's denial of their consolidated claims for asylum and withholding of deportation under section 208(a) and former section 243(h)(1) of the Immigration and Nationality Act. 8 U.S.C. § 1158(a) (2004); 8 U.S.C. § 1253(h)(1) (1996). Both Abay and Amare seek asylum based on their fear that, should they be returned to Ethiopia, Amare will be subjected to "female genital mutilation," a practice "nearly universal" in Ethiopia and to which an estimated 90% of women are subjected, according to State Department reports. The immigration judge held that neither Abay nor Amare established that she is a "refugee" eligible for asylum or withholding of deportation. We find that the evidence on the record as a whole compels the conclusion that both the minor child Amare and her mother have a well-

founded fear that Amare will be subjected to female genital mutilation should they be returned to Ethiopia and thus are "refugees" eligible for asylum under the Act. Accordingly, the petition for review is GRANTED and the case is remanded for further proceedings consistent with this opinion.

## I. Background

Petitioner Abay and her daughter, petitioner Amare, entered the United States on May 18, 1993, as visitors for pleasure. On May 30, 1996, following an unsuccessful application for asylum, Abay and Amare were each issued and served with a referral notice and order to show cause. At a master calendar hearing held by teleconference on August 29, 1996, and at which the minor daughter waived appearance, their separate cases were consolidated and Abay's was designated the "lead file." On behalf of both respondents, counsel conceded deportability and applied for relief in the form of asylum, withholding of deportation, and in the alternative, voluntary departure. On June 30, 1997, counsel submitted Abay's fully briefed application, in which she claimed that she was persecuted in the past, and feared persecution in the future, on account of her Amhara ethnicity, her Pentacostal Christian religious practice, and her membership in the All Amhara People's Organization, an opposition political party in Ethiopia. On August 6, 1997, counsel submitted a supplemental brief and exhibits supporting Amare's application in which Amare claimed that she feared being subjected to female genital mutilation upon her return to Ethiopia.

## II.  Legal framework and standard of review

The Attorney General has *discretion* to grant asylum to a person who qualifies as a "refugee" within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act. *See* 8 U.S.C. § 1158(b)(1). The Act defines a refugee as:

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

*Id.* § 1101(a)(42)(A). To obtain asylum, an alien must show that she is a refugee entitled to a discretionary grant of asylum. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998); *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). The asylum applicant bears the burden of establishing that she qualifies as a refugee "either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b).

An alien may demonstrate a well-founded fear of future persecution by showing that (1) he or she has a fear of persecution in his or her country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and (3) he or she is unable or unwilling to return to that country because of such fear. An applicant's fear of persecution must be both subjectively genuine and objectively reasonable.

*Mikhailevitch*, 146 F.3d at 389. If the applicant establishes past persecution, the applicant is entitled to a presumption of a well-founded fear of future persecution, and the burden then shifts to the Immigration and Naturalization Service to show by a preponderance of the evidence that "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country . . . on account of race, religion, nationality, membership in a particular social group, or

political opinion." 8 C.F.R. § 208.13(b)(1)(i)(A); *see Mikhailevitch*, 146 F.3d at 389. To establish eligibility for asylum, an alien is not required to present proof that future persecution is more likely than not. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.*

The petitioners also seek relief in the form of withholding of deportation under former § 1253(h)(1), a form of nondiscretionary relief that must be granted to aliens who can meet the more stringent standards governing such applications. To establish eligibility for nondiscretionary withholding of deportation, the alien must show that there is a "clear probability" that her "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." *Mikhailevitch*, 146 F.3d at 391. The applicant who fails to establish that she is a "refugee" eligible for asylum under § 1158 will necessarily fail to satisfy the standard governing § 1253(h)(1). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449-50 (1987); *Mikhailevitch*, 146 F.3d at 391. On the other hand, the applicant who establishes that she is a "refugee" eligible for asylum, but who is not granted asylum in the exercise of the Attorney General's discretion, may nevertheless be able meet the more stringent standard to show she is eligible for withholding of deportation.

Under our deferential standard of review, we must uphold the Board's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch*, 146 F.3d at 388 (internal quotation marks omitted); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). We may not reverse the Board's determination simply because we would have decided the matter differently. *See Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992). The petition for review may be granted only if the evidence presented "not only supports a

contrary conclusion, but indeed *compels* it." *Id.* at 152 (emphasis in original). The appropriate inquiry is whether the applicable evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481. Where, as here, the Board of Immigration Appeals affirms the decision of an immigration judge without opinion, we review the decision of the immigration judge directly. *Soadjede v. Ashcroft*, 324 F.3d 830, 832 (5th Cir. 2003).

## III. Discussion

### A. Female genital mutilation

Forced female genital mutilation involves the infliction of grave harm constituting persecution on account of membership in a particular social group that can form the basis of a successful claim for asylum. *In re Fauziya Kasinga*, 21 I. & N. Dec. 357, 365, Int. Dec. 3278 (BIA June 13, 1996); *see Abankwah v. INS*, 185 F.3d 18, 23-24 (2d Cir. 1999) (holding that the evidence compelled the conclusion that the petitioner had a well-founded fear of being subjected to female genital mutilation in Ghana as punishment for having engaged in premarital sex, and reversing the Board's decision to the contrary). Female genital mutilation, or FGM, is the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia.[1] Often performed under

---

[1] The Department of State has classified, based on World Health Organization typology, the prevalent forms of female genital mutilation. Type I, commonly referred to as "clitoridectomy," is the removal "of the clitoral hood with or without removal of all or part of the clitoris." Type II, commonly referred to as "excision," is the removal "of the clitoris together with part or all of the labia minora." Type III, commonly referred to as "infibulation," is the removal "of part or all of the external genitalia (clitoris, labia minora and labia majora) and stitching or narrowing of the vaginal opening, leaving a very small opening, about the size of a matchstick, to allow for the flow of urine and menstrual blood."

unsanitary conditions with highly rudimentary instruments, female genital mutilation is "extremely painful," "permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications," including "bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus." *In re Fauziya Kasinga*, 21 I. & N. Dec. at 361. Female genital mutilation can result in the permanent loss of genital sensation in the victim and the consequent elimination of sexual pleasure. *See id.*

The practice of FGM has been internationally recognized as a violation of women's and female children's rights. *See, e.g.*, Report of the Committee on the Elimination of All Forms of Discrimination Against Women, General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38 & Corr. 1, at 80, ¶ 438, U.N. Doc. A/45/38 (1990); Declaration on the Elimination of Violence Against Women, G.A. Res. 104, U.N. GAOR, 48th Sess., Art. 2(a), U.N. Doc. A/48/629 (1993) (including female genital mutilation as an example of violence covered by the resolution); Traditional or Customary Practices Affecting the Health of Women and Girls, G.A. Res. 128, U.N. GAOR, 56th Sess., Supp. 49, at 2, U.N. Doc. A/RES/56/128 (2001) (reaffirming that female genital mutilation "constitute[s] a definite form of violence against women and girls and a serious violation of their human rights"). In September 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act [IRRIRA], Congress criminalized the practice of female genital mutilation under federal law. *See* 18 U.S.C. § 116 (providing that whoever "knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia

---

*Prevalence of the Practice of Female Genital Mutilation (FGM); Laws Prohibiting FGM and Their Enforcement; Recommendations on How to Best Work to Eliminate FGM*, U.S. Dept. of State, Report on Female Genital Mutilation, at 5 (updated June 27, 2001), available at http://www.state.gov/g/wi/rls/rep/c6466.htm. Type II (excision) is the most widely practiced form. *Id.*

minora or clitoris of another person who has not attained 18 years" shall be fined or imprisoned).

At the hearing on the merits held on August 17, 1997, Abay testified that she is married and has four daughters. After she came to the United States with her youngest daughter, Abay's husband fled Ethiopia, leaving their three older daughters in the care of Abay's mother in Ethiopia. Abay herself was circumcised by her mother when she was nine years old.[2] Although she and her husband oppose the practice and have not subjected any of their daughters to it, Abay's mother had previously attempted to circumcise the three older daughters. It was only due to Abay's intervention that the daughters were not circumcised. Abay testified that her mother still wants all the girls to be circumcised, and that Abay would not be able to prevent the forced circumcision of any of her daughters by their future husbands or in-laws.

Burhan Amare is Abay's youngest daughter who, at the time of the hearing, was nine years old. Amare suffers from a profound hearing impairment. She testified through a sign language interpreter that she knew about circumcision, did not want to be subjected to it because she feared it would cause pain and bleeding, and was afraid to go back to Ethiopia because she feared her relatives or future husband or her husband's relatives would force her to be circumcised.

---

[2] At the hearing, the parties used the term "circumcision" without specifying the precise form of the practice involved. As noted above, the term "female genital mutilation" has become the preferred generic term when describing any form of physical mutilation to a female's genitals. The term "circumcision" is considered by many to be physically inaccurate in describing the most common form of the practice, Type II (excision), which results in the complete removal of the clitoris. *See, e.g.*, Hope Lewis, *Between Irua and "Female Genital Mutilation": Feminist Human Rights Discourse and the Cultural Divide*, 8 Harv. Hum. Rts. J. 1, 4-9 (1995) (discussing the debate over terminology and noting that "many feminist human rights activists and scholars argue that the term 'female circumcision' is misleading" because "most forms of male circumcision are far less invasive and physically damaging" than FGM).

According to the U.S. State Department Ethiopia Country Report on Human Rights Practices for 1996, which was included in the record, the practice of female genital mutilation in Ethiopia in 1996 was "nearly universal." Also included was a State Department Report on Female Genital Mutilation in Ethiopia in 1996, which indicated that approximately 90% of all females are subjected to some form of the practice.[3] The practice had not been specifically outlawed, and laws in place to prohibit harmful traditional practices are not, as a practical matter, enforced. Additional articles and reports submitted in support of Amare's claim explain that females who live in a culture where female genital mutilation is the norm and who do not undergo the procedure will be persecuted, subjected to ostracism, and considered unworthy of marriage.

**B. Amare's asylum claim based on her fear of female genital mutilation**

The immigration judge denied Amare's claim for asylum because she has "no imminent fear [of female genital mutilation], but rather a general ambiguous fear" if she is deported. He noted that "her parents are opposed to the practice and refuse to allow her to be circumcised" and that "[s]he has three teenage sisters who have not been circumcised." Pointing out that these three sisters live with the same relatives in Ethiopia who purportedly pose a threat to Amare, he concluded that he found it "hard to believe that this one daughter [Amare] would be forcibly circumcised when the other daughters are able to escape it."

---

[3] A recent State Department report on female genital mutilation in Ethiopia details the prevalence of the various forms of the practice. *Ethiopia: Report on Female Genital Mutilation (FGM) or Female Genital Cutting*, U.S. Dept. of State, Office of the Senior Coordinator for International Women's Issues (June 1, 2001), available at www.state.gov/g/wi/rls/rep/crfgm (Ethiopia). Clitoridectomy and excision are the two most common form practiced in Ethiopia, with excision being the most common. *See id.*

These conclusions underestimate the problem and do not take the full picture into account. At the time of the hearing, Amare was a nine-year-old child testifying in court about an extremely personal matter. Although her expression of fear in that context may have come across as "general" or "ambiguous," we note that the Immigration and Naturalization Service's guidelines for children's asylum claims, following the recommendations of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (1992), advises adjudicators to assess an asylum claim keeping in mind that very young children may be incapable of expressing fear to the same degree or with the same level of detail as an adult. *See Guidelines for Children's Asylum Claims*, *INS Policy and Procedural Memorandum from Jack Weiss, Acting Director, Office of International Affairs to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees)* at 26, Dec. 10, 1998, available at 1998 WL 34032561 (INS). In recommending a course of action for evaluating a child's fear, the Children's Guidelines note that the adjudicator must take the child's statements into account, but that "children under the age of 16 may lack the maturity to form a well-founded fear of persecution, thus requiring the adjudicator to give more weight to objective factors." *Id.* at 19. Further, the Guidelines suggest that "children's testimony should be given liberal "benefit of the doubt" with respect to evaluating a child's alleged fear of persecution. *Id.* at 26.

Should Amare be returned to Ethiopia, a country where the practice is "nearly universal" with 90% of females having been subjected to some form of it, it is probable that she would be subjected to that painful practice should she marry. Abay testified that the threat of female genital mutilation comes not only from Amare's own relatives, but also from any future husband and his relatives. Abay testified that she feared she would not be able to override the wishes of a husband or his family. At the time of the hearing, Amare's teenage sisters had not yet married. The fact that Amare's

sisters had been spared the practice at the hands of their own relatives does not sufficiently outweigh Abay's testimony that she would not be able to prevent a future husband or his relatives from demanding that it be done. Amare's clearly expressed fear is rooted in the culture of Ethiopia. Should she be forced to choose between marriage and likely mutilation on the one hand, and social ostracism on the other, we believe that any young girl faced with such a choice would have a legitimate fear of persecution and draw support from the Second Circuit's opinion in *Abankwah*, *supra*. Accordingly, we find that the evidence presented compels the conclusion that Amare has established that she is a "refugee" under the Act.

### C. Abay's asylum claim based on her fear that her daughter will be subjected to female genital mutilation

Abay specifically testified that she feared that her daughter would be forcibly circumcised by her relatives or her daughter's future husband and his family should she return to Ethiopia. In his written opinion, however, the immigration judge focused only on Abay's relatives, with whom Amare's unmarried teenage sisters lived in Ethiopia, and stated that he found it "hard to believe that this one daughter would be forcibly circumcised when the other daughters are able to escape it." (J.A. at 50.) The judge concluded that there was no objective basis upon which to base an asylum claim. As we stated previously, however, there is overwhelming objective evidence that a female child in Ethiopia will likely undergo female genital mutilation at some point. The issue before the Court is really whether Abay can seek asylum in her own right based on a fear that her child will be subjected to female genital mutilation.

Abay acknowledges that there is no express statutory authority for a parent to claim "derivative asylum" based on her child's asylee status. *See* 8 U.S.C. § 1158 (b)(3). She argues instead that she is eligible for asylum in her own right

based on her fear that her daughter will be subjected to the torture of female genital mutilation. In support of her argument, Abay points out that the Board has previously indicated that a family member may be eligible for asylum based upon the physical harm inflicted upon another family member. For example, in *Matter of C-Y-Z*, 21 I. & N. Dec. 915, Dec. 3319 (BIA 1997), an alien seeking asylum argued that the forced sterilization of his wife by government authorities in China conferred refugee status on him under Act.[4] The Board accepted the Service's concession that an alien whose spouse was forced to undergo sterilization could establish past persecution on account of political opinion and found that the alien established that he was a "refugee" within the meaning of the Act. *See id.* at 919-20. In a concurring opinion, Board member Rosenberg explained that a finding of persecution based on harm to an immediate family member is not uncommon:

> It is not as unusual as one or all of my colleagues writing separately would make it seem that the applicant should be granted asylum although the harm experienced was not by him, but by a family member.
> . . .
> It not only constitutes persecution for the asylum applicant to witness or experience the persecution of family members, but it serves to corroborate his or her own fear of persecution. The treatment of the applicant's wife supports the conclusion that the applicant, by virtue of the events culminating in his wife's forced sterilization, has suffered past persecution and that his fear is well founded.

---

[4]"[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion . . . ." 8 U.S.C. § 1101(a)(42)(B).

*Id.* at 926-27 (citations omitted).

We further note that the Service has previously granted other forms of relief, including relief under the more stringent standard of withholding of removal, to the parents of female children who reasonably fear that the children would be subject to female genital mutilation should they return to their parents' country of origin. *See, e.g.*, *Matter of Adeniji*, No. A41 542 131 (oral decision) (U.S. Dept. of Justice, Immigration Court, York, Penn., Mar. 10, 1998) (granting application for withholding of removal to an alien father otherwise ineligible for asylum because his citizen daughters would be forced to return to Nigeria with him, where they would likely be subject to female genital mutilation by relatives despite their father's wishes); *Matter of Oluloro*, No. A72 147 491 (oral decision) (U.S. Dept. of Justice, Immigration Court, Seattle, Wash., Mar. 23, 1994) (granting suspension of deportation, directly resulting in permanent resident status, to an alien mother because the risk that her U.S.-born daughters would be subjected to female genital mutilation in Nigeria "posed an extreme hardship" to the daughters).

In *Matter of Dibba*, No. A73 541 857 (BIA Nov. 23, 2001), an alien mother filed a motion to reopen her case to apply for asylum based on her fear that her citizen daughter would be subject to female genital mutilation in The Gambia. She argued that "she would be forced to allow the mutilation of her daughter and that the event and its consequences would cause her mental suffering sufficient to constitute persecution." *Id.* at 2. The Board noted that the record supported the prevalence of female genital mutilation in The Gambia and that, although the government disapproves of the practice, it is not illegal. The alien submitted evidence that she herself was subjected to FGM at a young age, and that her mother would demand that her daughter be similarly mutilated if she returned to The Gambia. Although the Board found that the alien had not yet "fully demonstrated" that she would be in fact forced to allow her daughter to be

circumcised, the Board found that she had presented a sufficient basis to reopen her case and apply for asylum based on a well-founded fear of persecution. *Id.* In addition, the Board made clear that the alien need not "prove that she would take the child with her as part of her burden to demonstrate eligibility for relief, if she has custody of the child. . . . [N]ormally a mother would not be expected to leave her child in the United States in order to avoid persecution." *Id.*

We do not agree with government counsel that there is no authority for granting asylum to Abay based on her fear that her daughter will be forced to undergo female genital mutilation. The Board's decision in *Dibba*, along with the decisions cited above, suggest a governing principle in favor of refugee status in cases where a parent and protector is faced with exposing her child to the clear risk of being subjected against her will to a practice that is a form of physical torture causing grave and permanent harm. Given the evidence in the record that female genital mutilation is "nearly universal" in Ethiopia; that Abay herself underwent the procedure at a young age; that Abay's mother has already attempted to mutilate Abay's older daughters, who still faced that prospect upon their marriage; that Abay would not be able to override any of her daughters' future husbands or in-law's wishes; and that the government of Ethiopia does not, as a practical matter, enforce laws intended to curb harmful traditional practices, we conclude that a rational factfinder would be compelled to find that Abay's fear of taking her daughter into the lion's den of female genital mutilation in Ethiopia and being forced to witness the pain and suffering of her daughter is well-founded. Accordingly, we find that Abay is also a "refugee" within the meaning of the Act.[5]

---

[5] Abay also seeks review of the Board's denial of her claim for asylum based on her fear of persecution on account of her membership in the All Amhara People's Organization, an opposition political party in Ethiopia. Because we decide the question of her refugee status based on

## IV. Conclusion

For the reasons stated above, we reverse the decision of the Board of Immigration Appeals that the petitioners are not eligible for asylum. Because the immigration judge did not reach the discretionary stage of their claims for asylum, we remand for proceedings not inconsistent with this opinion. Further, because the standard for granting withholding of deportation is more stringent than the standard for granting asylum, and because the immigration judge denied the request as an *a fortiori* conclusion, we also remand the request for withholding of deportation for further consideration in light of our conclusions stated above.[6]

---

female genital mutilation, we do not reach the merits of this claim.

[6]While we recognize that our colleague has written a concurrence, and not a dissent, it is important to note the differences between our opinion and his concurrence. The basis of the fear of persecution in this case is well-established on the record. The Government's position, and the decision of the Board of Immigration Appeals, to deport, despite that well-established fear of persecution, is clear. Therefore, based on the record, and the position of the government and BIA, the circumstances in this case are such that this issue must be confronted now.

---

## CONCURRENCE

---

SUTTON, Circuit Judge, concurring in the judgment. I agree with the majority that the prospect of female genital mutilation (FGM) may indeed give rise to a "well-founded fear" of persecution, and I agree with the majority that the Immigration Judge's efforts to resolve the claims of the daughter (Amare) and the mother (Abay) raise as many questions as they answer. On this record, I thus agree that the Immigration Judge's decision cannot be affirmed.

I concur in the judgment rather than in the opinion because I fear that the majority's opinion accepts two propositions in this area that current law does not support: (1) that women or girls may never be deported to a country where the incidence of FGM within the female population as a whole is high, regardless of the risk that a particular applicant will be subjected to FGM, and (2) that the parents of such children may not be deported either. As I read the relevant statutes, regulations and precedents, the law in this developing area does not support either generalization. In view of the stale nature of the evidence in this case as well as the fact that the administrative agency has not expressly given us its view on either point, I would prefer to ask the Immigration Judge to look at these issues in the first instance.

### I.

#### A.

In rejecting Amare's claim for asylum based on her fear of being subjected to FGM, the Immigration Judge relied predominantly on the fact that Amare's sisters—who still live in Ethiopia—have not been forced to undergo FGM. From this fact, the Immigration Judge reasoned that the threat to Amare could not be very serious either. That an asylum

applicant fails to show "a reasonable possibility [that] . . . she would be singled out individually for persecution," however, does not end the inquiry. 8 C.F.R. § 208.13(b)(2)(iii). An asylum applicant may still qualify as a refugee if she can show "that there is a pattern or practice . . . of persecution of a group of persons similarly situated" and that she is included within that group. *Id.* § 208.13(b)(2)(iii)(C); *see Ramsameachire v. Ashcroft*, 357 F.3d 169, 183 (2d Cir. 2004).

Correctly invoking this second ground for relief, Amare points to statistics collected by the State Department showing that 90% of women and girls in Ethiopia have undergone FGM, then argues that these statistics necessarily establish a "pattern or practice of persecution." Even if that is true, however, Amare still must show that she is included within a group at risk of being subjected involuntarily to FGM. 8 C.F.R. § 208.13(b)(2)(iii)(C). FGM practices vary by ethnic group, religion and geographic region, as well as by the age and marital status of the woman or girl. As a State Department report on FGM practices in Ethiopia acknowledges, some "population groups" within the country "do not practice FGM." JA 187. As the federal statute that criminalizes FGM in this country acknowledges in regulating the practice only with respect to girls under eighteen years of age, the risks associated with FGM differ between girls and women. *See* 18 U.S.C. § 116; *see also Nwaokolo v. INS*, 314 F.3d 303, 309 (7th Cir. 2002) (describing threat of FGM to four-year old girl as more significant than risk to 17-year old girl). And as another recent State Department report acknowledges, Maj. Op. at 6 n.1, the types of FGM practiced in Ethiopia are neither uniform in nature nor uniformly debilitating to a woman's physical and psychological health. Significant as the 90% may be, in other words, it does not establish that all women and girls—no matter their age, ethnic group, marital status, religion or geographic residence—face the same FGM risks or in some instances face any material risk at all. *See Matter of Oluloro*, No. A72 147 491, Slip Op. at 4 (Immigr. Ct. Mar. 23, 1994) (noting that in Nigeria,

where 50% of the total female population has undergone FGM, "the likelihood of forced FGM being visited on anyone outside [a specific] ethnic group or area is minimal to nonexistent").

The Immigration Judge did not consider any of these points, and the current record is either conspicuously silent on each point or is not helpful to Amare's application. In her case, for instance, it appears that she is of Amharic ethnicity and a Christian, two groups that practice FGM in Ethiopia. But the Amharas, according to the State Department reports, practice the least severe form of FGM—Type I—and Amare's age (17) may disqualify her even from that risk. In Ethiopia, it turns out, FGM is most frequently performed within days of birth or between the age of seven and puberty. *See* U.S. Dep't of State, Office of the Senior Coordinator for Int'l Women's Issues, *Ethiopia: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC)* (June 1, 2001), *at* http://www.state.gov/g/wi/rls/rep/crfgm/100098.htm. On this record, I submit, it makes sense to obtain more information and more current information about these issues before announcing an opinion that grants relief not just to Amare but potentially to any girl or woman from Ethiopia.

### B.

The current paucity of evidence regarding Amare's claim not only fails to make clear exactly what kind of risk she faces in returning to Ethiopia as a 17-year old girl, but it also fails to bring her within the orbit of any of the cases that have granted asylum in the context of an FGM claim. In the two instances in which a court of appeals granted relief on an FGM-based asylum claim, the evidence was far more concrete than it is here and the risk of FGM was far more imminent than it is here. In one case, the applicant offered evidence that she was a member of a particular tribe in Ghana that practices FGM as punishment for premarital sex; that she had engaged in premarital sex; that her tribe would assuredly

learn this fact; and that her tribe would punish her as a result. *See Abankwah v. INS*, 185 F.3d 18 (2d Cir. 1999). In the other case, the court relied on still more particularized evidence: the applicant's family had already paid the traditional "bride price," which created a binding marriage contract that permitted the man to force his bride to undergo FGM. *See Moshud v. Blackman*, Nos. 98-6481 & 02-1545, 2003 WL 21404334, at *2 (3d Cir. June 18, 2003). Likewise, the administrative decision that established FGM as a legitimate basis of persecution involved an imminent threat of forced FGM by the asylum applicant's aunt and husband stemming from an arranged marriage. *See In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996).

## II.

The immigration statutes and case law also fail to support Abay's—the mother's—derivative claim of asylum, at least on the current record. "A spouse or child . . . of an alien who is granted asylum," the applicable statute says, "may, if not otherwise eligible for asylum . . . , be granted the same status." 8 U.S.C. § 1158(b)(3)(A). By its terms, the statute does not include parents as individuals who may obtain a derivative grant of asylum. And to the extent Abay, like the applicant in the *Oluloro* case, *supra, see* Maj. Op. at 12, seeks a suspension of deportation based on "extreme hardship" to her child, *see* 8 U.S.C. § 1254(a)(2) (1995), that provision was repealed. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 308(b)(7), 110 Stat. 3009 (1996). The replacement provision does not encompass Abay's claim. *See* 8 U.S.C. § 1229b (allowing "cancellation of removal" for permanent resident aliens who, among other requirements, "establish[] that removal would result in exceptional and extremely unusual hardship to the alien's . . . child, who is a citizen of the United States or [an alien permanent resident]"). Nor does the regulatory authority that permits "humanitarian" grants of asylum add traction to Abay's derivative claim. It is reserved for individuals who have established past

persecution and would face "other serious harm" if deported, *see* 8 C.F.R. § 208.13(b)(1)(iii), a showing that Abay has not yet made.

Circuit court precedent does not advance this claim either, particularly in the absence of testimony that the child effectively would be deported alongside the parent. *See, e.g., Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003) (rejecting asylum claim to the extent it relied on mistreatment of family members rather than of the applicant); *Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003) (rejecting mother's claim for avoiding deportation based on the threat of FGM to her daughters as lacking in statutory or regulatory authority); *Osigwe v. Ashcroft*, No. 02-60725, 2003 WL 22287540, at *1 (5th Cir. Oct. 6, 2003) (noting that the parents of a girl who would be forced to undergo FGM if returned to Nigeria "are not eligible for asylum under the general asylum provisions based solely on their daughter's risk of being subject to FGM"); *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000). The Seventh Circuit, it is true, once endorsed a "constructive deportation" theory, which covered parents who established that their children (who otherwise had a legal right to remain in the country) would in effect be deported along with their parents and face "extreme hardship." *See Salameda v. INS*, 70 F.3d 447, 451 (7th Cir. 1995). But, again, this theory rested on the now-repealed immigration statute mentioned above. To the extent recent cases suggest that the theory has continuing currency, they do so in the context of concrete indications that the child would be forced to accompany the deported parent. *See Obazee v. Ashcroft*, No. 02-3416, 2003 WL 22473831, at *3 (7th Cir. Oct. 24, 2003) (acknowledging the "constructive deportation" theory but refusing to grant relief because the petitioner did not point to any evidence that her daughter would necessarily have to leave the United States); *Nwaokolo*, 314 F.3d at 310 (granting reopening to determine whether a mother could obtain relief under the Convention Against Torture based on the fear that her four-year old daughter would face involuntary FGM if she were deported).

No more helpful to this claim are the administrative decisions of the agency. *Matter of C-Y-Z*, 21 I. & N. Dec. 915 (BIA 1997), involved the asylum claim of a man whose wife was at risk of being forced to undergo sterilization. In considering whether the husband qualified as a "refugee" under 8 U.S.C. § 1101(a)(42), the parties agreed that "the forced sterilization of one spouse . . . is an act of persecution against the other spouse." *Id.* at 919. And while *Matter of Adeniji*, No. A41 542 131, Slip Op. at 10 (Immigr. Ct. Mar. 10, 1998), extended the *C-Y-Z* logic to the FGM context, it did so with respect to five- and six-year old children.

Also missing from the record is any evidence that Abay will be "faced with exposing her child to the [] risk of being subjected to" FGM unless she is granted asylum. Maj. Op. at 13. The record contains nothing but silence on whether Amare would follow her mother to Ethiopia if she were deported. As a 17-year old girl who has been in this country for almost 11 years, Amare may well have other options. More critically, this evidentiary void ought to be filled before relief is granted.

## III.

Even though the relevant statutes and case law currently do not support Amare's claim and do not support granting asylum to Abay on a derivative basis, I agree with the decision to remand the case. Each claim is of recent vintage, the record is conspicuously meager with respect to each claim, and the Immigration Judge ought to be given a chance to address each claim in the context of a fresh, recently-supplemented record and after consideration of the agency's "considerable experience and expertise" on these issues. *Azanor v. Ashcroft*, 364 F.3d. 1013, 1021 (9th Cir. 2004) (remanding case for consideration of an FGM-based derivative torture claim and treating the claim as a question of "first impression").