NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0594n.06

No. 19-3841

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MERCY WEST, | ) | |
| | ) | **FILED** |
| Petitioner, | ) | Oct 20, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE UNITED STATES |
| WILLIAM P. BARR, Attorney General, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| Respondent. | ) | |
| | ) | |

BEFORE: ROGERS, SUTTON, and STRANCH, Circuit Judges.

ROGERS, J., delivered the opinion of the court in which SUTTON and STRANCH, JJ., joined. STRANCH, J. (pp. 15–16), delivered a separate concurring opinion.

ROGERS, Circuit Judge. Mercy West, a citizen of Nigeria, appeals the Board of Immigration Appeals' denial of her application for withholding of removal. Of the issues that West raises in this appeal, two are beyond the court's jurisdiction because they were not raised to the Board, and another was not relied upon by the Board in its final ruling. The only remaining aspect of the Board's decision before us is its determination that West has not shown that, if she returns to Nigeria, it is more likely than not that her daughters would be subjected to female genital mutilation. That determination, however, is supported by substantial evidence, including a decline in the incidence of FGM in Nigeria, as well as the ability of her daughters to avoid FGM by living in Lagos rather than in West's home village.

West, who is forty-seven years old, comes from the Ibo tribe in Umu-Ejechi Umualum, a village in the town of Nekede in southeastern Nigeria. At the age of seven, West became a victim of female genital mutilation, a surgical operation "involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia." *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004). In 1994, West left her village and moved to Lagos, where she went to college for accounting. She married Jerry Okoro two years later and gave birth to a daughter in 2001. West, along with her husband and daughter, were admitted to the U.S. in April 2003 on nonimmigrant tourist visas, with authority to stay for six months. West and her daughter have remained in the U.S. ever since. In 2005, West had a second daughter with Okoro. In 2008, West divorced Okoro and married Marcel West. Marcel filed an alien relative petition on West's behalf, but that petition was denied in 2010 on the grounds that the marriage was fraudulent and that Marcel had been convicted of a sex crime. West has since divorced Marcel and is now married to Vernon Hill, a U.S. citizen.

Later in 2010, the Department of Homeland Security sought to remove West on the basis that she was an alien who had overstayed her visa. *See* 8 U.S.C. § 1227(a)(1)(B). West, who was represented by counsel, conceded removability, but filed an application for withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and, alternatively, for voluntary departure. West wrote in her application that she feared her daughters would be subjected to female genital mutilation if she were deported to Nigeria. In support of this statement, West recounted her own experience with female genital mutilation and produced two letters that appeared to have been written in 2006 and 2007—one from her brother and the other from a community organization in her hometown—warning her that she needed to have her daughters circumcised. The letter from West's brother, who resided in Nigeria, sounded a "warning concerning the need for you to either come home with

your daughter . . . for her circumcision or you make sure it is done there [in the U.S.] without delay," said it would "avoid much pains" to have the procedure "done on time," and explained that "[i]n our tradition, it is mandatory that a newborn babe is circum[cis]ed, without which he or she is not recognized as a true son or daughter of the soil." The other letter, purportedly sent from the "Muwejechi Umualum Town Women's Development Union," congratulated West on her new baby, before "warning" West and her husband "not to forget that we have a culture in Umualum village," and that "no woman that is not circumcised will ever [live] among us here in Umualum village," "[s]o the earlier you circumcise your baby girls, the better for you." The letter went on to state that if West did not circumcise her daughter, she would be "creating a very big problem for that baby because no [matter] how long you people lived [there], any time any day [you're] back here with that girl, she will never stay one day in this village without being circumcised, even if she is one Hundred years old."

West also included an excerpt of a State Department country report for Nigeria from 2001, which cited studies on the prevalence of female genital mutilation in Nigeria. According to this report, around 60% of women in Nigeria in 1996 and 1997 had been circumcised, with a 1997 study estimating that between 40 and 50% of women had been circumcised in West's home state of Imo.[1]

At a hearing before the Immigration Judge ("IJ"), West recounted her experience undergoing female genital mutilation. West indicated that she did not know the whereabouts of her daughters' biological father and that, if she were removed to Nigeria, her children would not be staying with their father. West further stated that she did not know of anyone who would take care of her daughters in the U.S. if she left. When asked why she was afraid of going back to

---

[1] It is not clear from the report whether the state-specific and national data came from the same 1997 study.

Nigeria, West answered, "My children—my two young girls. They are female. I don't want them to go through what I have gone through under the circumcision." West insisted that her family back home would circumcise her daughters regardless of their age. West also told the IJ that in 2001, shortly after giving birth to her first daughter, two elders from her village came to visit her in Lagos and inquired about getting West's daughter circumcised. The women never came back, however, and West left Lagos for the U.S. about a year and a half later. West further testified that she dropped out of college in 1996 after she got married because her husband was supporting her financially. West indicated that she would return to her village if deported to Nigeria and insisted that wherever she lived in Nigeria—including Lagos—the village elders would find her.

In August 2017, the IJ denied West's application for withholding of removal. The IJ first found West not credible. According to the IJ, West's "demeanor was inconsistent with that of a credible witness and called her candor into question." The IJ explained that West's "answers were often evasive and vague[,] lacked detail on important matters," and that West "seemed to simply recite the same information, that 'it's tradition,' regardless of the question asked of her." The IJ found that West's "testimony was implausible and embellished at times"—specifically, her assertion that agents from her village could locate every individual who left the village throughout Nigeria. The IJ also relied upon inconsistencies in West's testimony regarding her relocation to Lagos. The IJ noted that "[d]uring both direct and cross examination, she testified that she fled to Lagos when her first daughter was born in 2001," but that "when questioned by the Court, she stated that she moved to Lagos to attend college in 1994, and had never moved back to her village."

In the alternative, the IJ ruled that, even assuming that West was credible, she could not show entitlement to withholding of removal. While West had established past persecution in the form of subjection to female genital mutilation, and was therefore entitled to a presumption of

future persecution, the IJ concluded that the Government had successfully rebutted that presumption by demonstrating that conditions in Nigeria had improved and that West and her children could safely relocate to Lagos.

With respect to the country conditions in Nigeria, the IJ noted a 2015 State Department country report for Nigeria submitted by the Government, which stated that Nigeria had recently banned the practice of female genital mutilation and that the Ministry of Health and non-governmental organizations had sponsored public awareness campaigns regarding the dangers of female genital mutilation. The IJ also reasoned in part as follows:

> the United States Department of State 2001 Nigeria: Report on FGM ("2001 Report on FGM") indicates that according to a 1997 study, sixty percent of the nation's total female population had undergone some form of FGM. Additionally, the 2001 Report on FGM states that "the campaign against FGM has long been waged, for the most part, by international, national, and non-governmental organizations," and that "the government has public[ly] opposed the practice . . . [but] there is no federal law banning FGM in Nigeria." On the other hand, the 2015 Human Rights Report for Nigeria indicates that in 2008 only "29.6 percent of girls and women ages 15 to 49 had undergone FGM, and . . . in 2013, 14 percent of girls from newborn to age 14 had undergone FGM." This demonstrates a significant decrease in the number of women and girls who undergo FGM in Nigeria.

(Citations omitted.) The IJ concluded that "conditions in Nigeria have changed to such an extent that it is no longer <u>more likely than not</u> that respondent would be similarly persecuted if she returns to Nigeria." (Emphasis in original.)

The IJ also concluded that West "has not established that she could not reasonably relocate within Nigeria." The IJ reasoned that West could go to the megacity of Lagos, where she had safely lived with her daughter for a year and a half, and where the rate of female genital mutilation was low. The IJ observed that while two village elders who had visited West when she lived in Lagos did discuss circumcision for her daughter, they did not make any threats and did not contact

her later. Finally, the IJ noted that the above-mentioned letters from her home village did not threaten West with harm if she did not comply with the requests to circumcise her daughters.

In its opinion, the IJ rejected West's argument that her case was analogous to *Abay*, which applied the standard for asylum rather than withholding of removal. *Abay* held that a mother's fear that her minor alien daughter would be forced to undergo female genital mutilation in Ethiopia was sufficient to demonstrate a fear of future persecution. 368 F.3d at 642. The IJ concluded that the overall rate of female genital mutilation was significantly lower in Nigeria—around 30%—than it had been in Ethiopia at the time *Abay* was decided—over 90%—and therefore *Abay* was distinguishable. The IJ reasoned that the present case was much closer to *Dieng v. Holder*, 698 F.3d 866, 873 (6th Cir. 2012), where we held that an asylum seeker could not show a likelihood that her daughter would be subjected to female genital mutilation in part because the rate of the practice in her home country of Senegal was only 20%.

On West's appeal to the Board of Immigration Appeals, the Board affirmed. The Board assumed for purposes of its opinion that West had testified credibly, but in any event concluded that the IJ had not clearly erred in determining that conditions in Nigeria had changed. In particular, the Board noted that Nigeria had since criminalized FGM. The Board also noted the two studies described in the 2015 State Department report, one showing that in 2008, 29.6% of Nigerian women between the ages of 15 and 49 had been circumcised, and another showing that in 2013, 14% of Nigerian girls under the age of 14 reported being circumcised. The Board compared these studies to those described in the 2001 State Department report, which showed overall circumcision rates for Nigerian women of about 60%. The Board also observed that West had "not meaningfully challenge[d]" the IJ's statistical analysis regarding changed conditions in Nigeria.

The Board also held that it was not clear error for the IJ to find that West could successfully settle in Lagos upon returning to Nigeria. As the IJ had, the Board highlighted that West had lived in Lagos from 1994 until 2003, and that despite having been visited by village elders in Lagos, West and her baby had continued to live there unharmed until their departure to the U.S. a year and a half later. The Board therefore dismissed West's appeal.

West next petitioned this court for review of the Board's decision. On the Government's unopposed motion, we remanded the case "so that the BIA may consider: (1) West's claim of a well-founded fear of future persecution based on the contention that her two daughters would be subject to female genital mutilation in Nigeria; and (2) the reasonableness of internal relocation." On remand, the Board correctly noted that the Government's motion for remand and this court's remand order referred in part to an incorrect standard. West has not applied for asylum, and consideration of whether she has a well-founded fear of future persecution is part of the standard for establishing asylum eligibility. *See Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004); 8 C.F.R. § 208.13(b). Asylum and withholding of removal are distinct forms of relief, and applications for withholding of removal are generally governed by a more demanding standard. *INS v. Cardoza-Fonesca*, 480 U.S. 421, 428 n.6, 449 (1987); *Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006). In short, withholding of removal requires a showing that "it is more likely than not that the alien would be subject to persecution in the country to which [s]he would be returned," whereas an asylum applicant need make only the lesser showing of "a well-founded fear" of such persecution. *Cardoza-Fonseca*, 480 U.S. at 423, 427–28 (citations and internal quotation marks omitted). Having identified the error, the Board proceeded to apply the appropriate standard for West's application for withholding of removal.

The Board proceeded again to dismiss West's appeal, for substantially the same reasons it had relied upon before. In addition, the Board ruled that "the respondent is presently married to a United States citizen; thus, the respondent's two daughters can remain in the United States with their stepfather in the event that she returns to Nigeria." The BIA further stated in a footnote that "although the respondent indicates on appeal that 'she would not leave her children with' her husband [citing West's brief], she has not articulated any reason as to why her daughters (one of whom is a United States citizen) could not remain in the United States with their stepfather, save for a brief, vague reference to 'the past bad experiences in her prior marriages.'" West once again sought reversal of the Board's decision in a petition to this court.

On appeal, West asserts, and the Government does not directly challenge, that her undergoing female genital mutilation in Nigeria constitutes past persecution on account of membership in a particular social group; specifically, the Ibo tribe in Nekede, Nigeria that performs female genital mutilation. West's theory of future persecution is that she will suffer psychological harm because of the likelihood that her daughters—who will accompany her back to Nigeria—will be forced to undergo female genital mutilation. *See Abay*, 368 F.3d at 641–42. The Government asserts, however, that the agency rebutted the presumption of future persecution by showing that conditions in Nigeria have improved since West underwent female genital mutilation and, in addition, that West and her daughters would be able to internally relocate to Lagos, where the threat of female genital mutilation is significantly lower. Because substantial evidence supports the Board's determination, we must deny the petition.

It will help to isolate the issue before us by clearing the underbrush of a number of other issues that were either not raised before the agency, or, although addressed below, are not contested on this appeal. For instance, West argues for the first time on appeal that she is entitled to

withholding of removal by virtue of continuing harm to herself from the FGM that she suffered as a child, apart from harm from any FGM that her daughters may suffer. She relies in this respect upon *Mohammed v. Gonzales*, 400 F.3d 785, 802 (9th Cir. 2005). Under 8 U.S.C. § 1252(d), "[a] court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." We have held that this exhaustion requirement is jurisdictional. *See Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004). Accordingly, because West did not previously present her argument of "continuing harm" to herself, the argument is jurisdictionally barred.

West contends that she raised her continuing harm argument to the Board when she "argued that she underwent FGM and . . . argued that she established eligibility for withholding of removal." In West's view, the continuing harm theory "is simply an iteration of the claim for withholding of removal" and therefore need not have been raised separately. But an argument is not preserved for appeal simply because it happens to fall under the umbrella of a properly presented claim. Rather, "the exhaustion requirement requires that the petitioner press all reviewable *issues* to the BIA" and, furthermore, "each issue 'must be reasonably developed in the petitioner's brief to the BIA.'" *Garcia-Romo v. Barr*, 940 F.3d 192, 198 (6th Cir. 2019) (emphasis added) (quoting *Khalili v. Holder*, 557 F.3d 429, 432–33 (6th Cir. 2009)). West's brief to the Board focused on the potential for harm to her daughters, stating that "[t]he unresolved matter is whether Respondent has established eligibility for withholding of removal based on her fear that a United States citizen child . . . and Nigerian citizen child . . . will be persecuted by subjecting them to FGM procedure, if the Respondent is removed." Further, West in her brief relied principally on our decision in *Abay*, which dealt with a mother's claim for asylum based on her fear that her daughter would be forced to undergo female genital mutilation. Moreover, West

characterized her claim similarly in her notice of appeal to the Board, which stated, "if forced to return to Nigeria, [West's] female children will be forced to undergo the savage FGM procedure. . . . Respondent has been informed by her family and her town's elders to bring her female children back to Nigeria for circumcision." In none of her submissions to the Board did West raise a theory of continuing harm based on her own subjection to female genital mutilation. Unsurprisingly, then, the Board did not address the theory of continuing harm to West in its written decision.[2] One of the purposes of § 1252(d)(1)'s exhaustion requirement is "to ensure that the agency responsible for constructing and applying the immigration laws and implementing regulations[] has had a full opportunity to consider a petitioner's claims." *Garcia-Romo*, 940 F.3d at 198 (quoting *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010)). The Board was deprived of that opportunity here with respect to West's claim of continuing harm.

*Hasson v. Mukasey*, 281 F. App'x 453 (6th Cir. 2008) (per curiam), relied upon by West, is not to the contrary. There, we determined that the petitioner had exhausted his claims for asylum, withholding of removal, and protection under the Convention Against Torture despite the petitioner's having phrased his arguments to the Board only in terms of the denial of his asylum claim. *Id.* at 456. This was so because "Hasson's arguments regarding his asylum claim also addressed the first necessary element of his claims for withholding of removal and CAT protection," and thus "Hasson's failure to independently argue his claims for withholding of removal and CAT protection [did] not impact any of the purposes of the exhaustion requirement."

---

[2] West's assertion in the alternative that the Board sua sponte raised the continuing harm issue—and thus preserved the issue for appeal—is unfounded. West points to the following passage in the Board's opinion as evidence that the Board reached the continuing harm issue: "[Mercy] is not eligible for withholding of removal because she has not established that it is more likely than not that she would be subject to persecution on account of a protected ground if she returns to Nigeria." When read in context, however, this statement is clearly referring to West's argument that her fear of persecution stems from the belief that her daughters would be forced to undergo female genital mutilation in Nigeria. Nowhere in its opinion does the Board mention the continuing harm theory, and in fact stated at the outset that West "fears harm in Nigeria because her two daughters will be forced to undergo female genital mutilation."

*Id.* Here, in contrast, West's claim of persecution based on continuing harm to herself from having undergone female genital mutilation is not subsumed by a claim of persecution based on a fear of harm to her daughters.

For the same reason, we also lack jurisdiction to consider West's argument, not raised below, that she would suffer persecution at the hands of the United States as a result of being separated from her children. West argues that the Board considered this claim by reasoning that West's daughters could avoid the risk of female genital mutilation by staying in the United States with West's U.S. citizen husband. But the Board's recognition of the possibility that West would be separated from her daughters is hardly a decision on the merits of whether that separation would constitute persecution. West has thus failed to preserve her family-separation claim for review.[3]

West also argues at length that her testimony before the IJ was credible. However, the Board assumed in its first decision that West's testimony was credible, and did not address the IJ's adverse credibility determination in its decision following the remand. We review the Board's opinion as the final agency decision, *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007), and agency decisions are reviewed "solely by the grounds invoked by the agency," *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Accordingly, we likewise assume for purposes of this petition for review that West's testimony was credible, and need not address the issue.

Thus, the only issue before us is whether substantial evidence supported the Board's rejection of withholding of removal on the basis of changed circumstances, and on the possibility

---

[3] Moreover, this argument cuts against West's primary argument that she is more likely than not to suffer from the imposition of FGM upon one of her daughters. We need not, however, rely on the possibility noted by the BIA that West's daughters would stay in the United States if West were removed to Nigeria. One of West's daughters is a U.S. citizen—that child could "remain in the United States either by staying with [her] relative, or through the appointment of a guardian until she reaches the age of majority." *Dieng*, 698 F.3d at 876. West's other daughter, who was born in Nigeria, has now reached the age of majority and thus is no longer legally dependent upon West for care. The Government, however, does not rely in its brief on the possibility that West's daughters would not accompany West to Nigeria if she is removed, and we accordingly assume that they would.

of relocation in Nigeria, with respect to harm from the imposition of FGM on one or both of West's daughters. Substantial evidence supports these conclusions.

Withholding of removal was properly denied because West failed to demonstrate that, upon her deportation to a designated country, her "life or freedom would be threatened in that country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "An applicant must provide evidence showing . . . 'that it is more likely than not that [she] would be subject to persecution.'" *Berri*, 468 F.3d at 397 (quoting *INS v. Stevic*, 467 U.S. 407, 423 (1984)). Moreover, an alien who demonstrates past persecution on the basis of a protected ground is entitled to a rebuttable presumption of future persecution on that same ground. 8 C.F.R. § 1208.16(b)(1). The Government has first rebutted that presumption by showing that "[t]here has been a fundamental change in circumstances such that [West's] life or freedom would not be threatened on account of" any of the protected grounds in the statute. *Id.* § 1208.16(b)(1)(i)(A). The Government has also rebutted the presumption by showing that West "could avoid a future threat to . . . her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect [her] to do so." *Id.* § 1208(b)(1)(i)(B). In this case, substantial evidence supports these two rebuttal bases.

First, the agency's determination that relevant conditions in Nigeria had sufficiently changed was supported by substantial evidence. As it had in the first instance, the Board, in its decision following the remand, cited evidence that FGM has been criminalized in Nigeria since 2015 and that, according to the 2015 report, only 29.6% of Nigerian women between the ages of 15 to 49 had been circumcised. West's contention that, because other laws in Nigeria have been ineffectual, the criminalization of FGM would not affect the incidence of future procedures is insufficient to compel a conclusion contrary to the Board's and, thus, does not require the court to

reverse the agency's decision. *See Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (stating the review standard). The same is true of her arguments challenging the probative value of the cited data, and we should not reverse simply because the agency's decision might have relied on "questionable assumptions and conclusions." *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005).

West takes issue with the following analysis, stated in the BIA's first decision, and partially restated in its second decision:

> The Immigration Judge noted that, according to the 2015 State Department report on country conditions in Nigeria, in 2008 only 29.6 percent of girls and women ages 15 to 49 had undergone FGM, and in 2013, 14 percent of girls from newborn to age 14 had undergone FGM, as compared with a 1997 study, which indicates that 60% of Nigeria's total female population had undergone some form of FGM.

West calls this analysis "apples to oranges" because the 2015 report looks at a specific age group while the 1997 study looks at total female population. But that is precisely the point of the IJ's comparison: the 60% number included women who were subjected to FGM many years ago, while the lesser number referred to women who could have been subjected to FGM only in the previous 14 years. If the numbers are accurate, the difference supports the finding that there has been a decrease in the incidence of FGM.

Second, the Board's determination that West and her daughters would be able to internally relocate to Lagos, where the threat of female genital mutilation is significantly lower, was also supported by substantial evidence. West's contention that the Board failed to adequately address the factors set forth in 8 C.F.R. § 1208.16(b)(3) is unavailing. After citing the applicable regulation and the factors that should be considered, the Board discussed how West had lived in Lagos from 1994 to 2003, and for almost two years of that time with one of her daughters, who was not harmed or threatened. Contrary to West's argument, the Board did not ignore that West had been visited

in Lagos by women from her former village; rather, the Board acknowledged that visit and noted that these women did not threaten or harm the child, and they never returned.

A claim for withholding of removal requires an applicant to make a greater showing than does an asylum claim. The relevant question here is not whether West has a well-founded fear of future persecution but, rather, whether the Government has shown either that "[t]here has been a fundamental change in circumstances such that [her] life or freedom would not be threatened on account of" any of the grounds specified in the statute, or that West "could avoid the future threat to [her] life or freedom by relocating to another part of [Nigeria] and, under all the circumstances, it would be reasonable to expect [her] to do so." 8 C.F.R. § 1208.16(b)(1)(i). There was substantial evidence to reject West's claim for withholding of removal, and the record does not compel conclusions contrary to the Board's: that conditions in Nigeria have sufficiently changed and that West and her daughters could relocate to Lagos.

The petition for review is denied.

**JANE B. STRANCH, Circuit Judge, concurring.** Mercy West was subjected to female genital mutilation when she was seven years old in her home country of Nigeria. In *Mohammed v. Gonzales*, 400 F.3d 785, 796 (9th Cir. 2005), the Ninth Circuit described that procedure as "extremely painful, physically invasive, psychologically damaging and permanently disfiguring." For Mercy West, it was both "mandatory" and "very painful." She describes how the village elders restrained her arms and legs and used a machete. The procedure took "hours, because of the struggle" and she testified that "I thought I—you know, I would bleed to death."

I agree with the Ninth Circuit that "female genital mutilation is a permanent and continuing act of persecution," which should here make West's presumption of future persecution unrebuttable. *Sene v United States Attorney General*, 679 F. App'x 463, 466 (6th Cir. 2017) (Stranch, J., concurring). In the Ninth Circuit's view, the procedure West underwent is analogous to forced sterilization, and a person who has endured either horror "does not need to have a fear of the same persecution recurring in the future in order to be eligible for withholding of removal." *Mohammed*, 400 F.3d at 799. I agree, and I would hold that West qualifies for withholding of removal. But our opinion does not provide West with withholding of removal because our circuit has failed to adopt *Mohammad*'s reasoning.

West, moreover, is also faulted here for having presented arguments to the BIA concerning only her fear for her daughters, and for failing to have raised the issue of her own continuing and permanent injury. I find that sadly ironic—in *Sene,* we acknowledged that our precedent found insufficient fear of FGM for adult women and I suggested Sene should have pursued the claim based on her fear that "the terrible legacy of female genital mutilation" would be borne by her daughter. 679 F. App'x at 467. So, Mercy West did that here. And now we tell her that because she has not pursued to exhaustion the claim for her own continuing harm, this court cannot now

consider it as the Board was deprived of "a full opportunity to consider" her claim. *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (2010).

Our decision recognizes the BIA's explanation that the 2015 State Department County Report for Nigeria shows that only about 30% of "girls and women ages 15 to 49 had undergone FGM" in 2008. This statistic makes Mercy West's case more like *Dieng v Holder*, 698 F.3d 866 (6th Cir. 2012), in which the rate of female genital mutilation in the destination country was 20% and this court denied asylum, than it is *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004), where the rate was 90% and this court granted asylum. Given our regrettable precedent, I am constrained to concur with the majority. So here we remain, denying the protection of our shores to another woman suffering the continuing and permanent injury of female genital mutilation while living in grave fear that the same harm will be perpetrated on her own daughters.