NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0681n.06
Filed: September 8, 2006

No. 05-3741

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LEK DOKAJ,               )
                        )
        Petitioner,     )
                        )
v.                      )     ON PETITION FOR REVIEW OF AN
                        )     ORDER OF THE BOARD OF
ALBERTO R. GONZALES, Attorney  )  IMMIGRATION APPEALS
General,                )
                        )
        Respondent.     )
                        )

Before: GIBBONS and ROGERS, Circuit Judges; HOLSCHUH, District Judge.*

        **JOHN D. HOLSCHUH, District Judge.** Lek Dokaj, a native and citizen of Albania,

appeals the denial of his claims for asylum, withholding of removal, and protection under the

United Nations Convention Against Torture ("CAT"). For the following reasons, this court

denies his petition for review.

**A.**

        Petitioner alleges that he has been persecuted because of his political activities on behalf

of the Democratic Party in Albania. He contends that, if forced to return, he will be killed or

_____

        * The Honorable John D. Holschuh, United States District Judge for the Southern District
of Ohio, sitting by designation.

1

arrested, incarcerated, and subjected to cruel treatment. Dokaj entered the United States in December of 2000, and filed an application for asylum. His application was administratively denied on May 31, 2001, and the Immigration and Naturalization Service instituted removal proceedings. Dokaj then conceded removability, renewed his application for asylum, and applied for withholding of removal and CAT protection.

Asylum may be granted to an applicant who is a "refugee" within the meaning of the Immigration and Nationality Act. 8 U.S.C. § 1158(b)(1)(A). A "refugee" is a person who is unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If an applicant establishes past persecution on account of one of the qualifying grounds, there is a rebuttable presumption that he also has a well-founded fear of future persecution on that same ground. 8 C.F.R. § 1208.13(b)(1). This presumption may be rebutted by showing a "fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 1208.13(b)(1)(i)(A). To establish a well-founded fear of persecution without relying on past persecution, an applicant must establish that: (1) he has a fear of persecution on one of the qualifying grounds; (2) there is a reasonable possibility of suffering persecution upon return; and (3) he is unable or unwilling to return to, or avail himself of the protection of, that country because of such fear. 8 C.F.R. § 1208.13(b)(2)(i). "An applicant's fear of persecution must be both subjectively genuine and objectively reasonable." *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004).

To establish eligibility for withholding of removal to a designated country, an applicant

must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion*." 8 U.S.C. § 1231(b)(3)(A). In order to qualify for withholding of removal, the alien must demonstrate that there is a clear probability, *i.e.*, that it is more likely than not, that he would be subject to persecution if he were to return to the designated country. *Liti v. Gonzales*, 411 F.3d 631, 640-41 (6th Cir. 2005); *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). Thus, "an applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). It therefore follows that if an applicant cannot demonstrate that he is eligible for asylum, then he cannot satisfy the more stringent standard for withholding of removal. *Mikhailevitch*, 146 F.3d at 391.

An applicant for CAT protection must prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The torture that would arise upon removal must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

**B.**

The Immigration Judge ("IJ") held a hearing on July 28, 2003 and, on December 1, 2003, issued a written decision denying Dokaj's applications for asylum, withholding of removal, and CAT protection. The IJ noted that Dokaj testified that he had been arrested at least four times over a ten year period because of his participation in the Democratic Party and had often been mistreated by the Albanian authorities. Dokaj also testified that his house was fired on by unknown persons in March of 1997, and that his wife was threatened a few weeks later. In

3

addition, Dokaj testified that on August 28, 2000, prior to an election, his house was burned down for political reasons, again by unknown persons. Dokaj then testified about being arrested, jailed, and beaten on November 25, 2000, after his party's candidate won the election. He claimed that he was treated by a private doctor for serious injuries to his forehead and a cut on his back. He testified that he was also treated by Dr. Zeqir Duka, a "forensic" doctor for the Democratic Party in Albania.

The IJ found that Dokaj had not established a credible claim for asylum. The IJ's adverse credibility determination was based, in large part, on Dokaj's submission of a "verification" purportedly issued by Dr. Duka of the Department of Public Health in Albania. That document, dated March 7, 2001, stated that on November 25, 2000, Dokaj:

> came to us for medical treatment and wound accusations. . . . These wounds were caused by the violence exercised on him by means of hard objects from the police in the isolation rooms, two days after the mandate of the democrat candidate in the Commune of Kastrat. It results that he has eye reddening, bruises in different parts of the body, swallowing [sic] of the wrists, loss of balance and other second hand damages.

One week before the hearing, the Government submitted a report of a consular investigator from the U.S. Embassy in Albania who concluded that Dr. Duka's medical report was fraudulent. The investigator's report stated:

> The certificate issued on March 7, 2001, by the coroner service . . . concerning Mr. Lek Dokaj is not valid. On October [illegible], 2002, the consular investigator met with Mr. Zeqir Duka . . . The investigator showed Mr. Duka the copy of the certificate submitted by the alien and asked if it was genuine. Mr. Duka stated that Mr. Dokaj's certification was not valid and coroner had not issued it. Mr. Dukaj [sic] also stated that the name, Lek Dokaj did not appear in record [sic] of that service.

4

At the hearing, Dokaj's attorney acknowledged that the consular investigator's report was quite damaging. He noted, however, that he had only recently received a copy of it and was not yet fully prepared to respond. Prior to the hearing, his client was able to obtain a supplemental declaration from Dr. Duka, dated July 25, 2003. It stated that on November 25, 2000, Dokaj had "presented near by this service" with "some signes [sic] of violence, hematomas, ecimoza [sic] in eyes and in different parties [sic] of body." Dokaj's attorney presented the supplemental declaration to the IJ, but he also requested an opportunity to obtain an additional statement from Dr. Duka that directly addressed the allegations of fraud. The IJ gave Dokaj fourteen days after the hearing to submit additional evidence to rebut the investigator's report.

Dokaj later submitted a supplemental declaration from Dr. Duka, dated July 30, 2003, in which Dr. Duka verified that he had issued the March 7, 2001 report submitted by Dokaj. Dr. Duka also acknowledged that he was contacted by the consular investigator, but he stated that the investigator had "misinterpreted or changed" his testimony.

Despite the supplemental declarations, the IJ nevertheless concluded that the March 7, 2001 report was fraudulent. The IJ found that the consular investigator's report was reliable and noted that the investigator had concluded that other unrelated documents submitted by Dokaj in support of his application were valid. The IJ noted that the date in Dr. Duka's report, November 25, 2000, was different from the date on which Dokaj previously claimed to have been beaten.[1]

---

[1] At the hearing, Dokaj was asked about notes taken by an asylum officer during an interview in 2001. Those notes appear to indicate that Dokaj may have told him that the arrest occurred on August 25, 2000 rather than November 25, 2000. The IJ's decision, however, states that Dokaj said that the incident occurred on October 25, 2000. In any event, there is a discrepancy concerning the date of the alleged incident.

5

The IJ also gave "considerable weight" to the May, 2001 State Department Profile of Asylum Claims and Country Conditions of Albania. That document states that, "[d]ocuments issued by Albanian medical practitioners are rarely reliable; forged documents are also common." The IJ found that the fraudulent nature of the March 7, 2001 document undermined the credibility of Dokaj's entire claim. The IJ also noted that, even though Dokaj testified that his family members were present during some of the alleged incidents of persecution, and that he maintained regular contact with those family members, he failed to submit any corroborating statements from them.

In the alternative, the IJ held that, even if Dokaj's claims were credible, Dokaj had failed to establish an asylum claim on the merits. The IJ noted that Albania is no longer governed by the former Communist regime and found that Dokaj had not established a well-founded fear of future persecution. He noted that Dokaj's parents still live in Albania, and there is no evidence that they have been threatened or harmed. Moreover, the IJ noted that Dokaj's arrests had occurred during large demonstrations, and there was no credible evidence to suggest that he had been singled out because of his political beliefs. The IJ also found entirely speculative Dokaj's belief that his house was fired upon and later burned down because of his political beliefs. Finally, the IJ found that Dokaj had failed to establish that it was more likely than not that he would be tortured if he returned to Albania. For these reasons, the IJ denied Dokaj's applications for asylum, withholding of removal, and CAT relief.

Dokaj appealed to the Board of Immigration Appeals ("BIA") and challenged the admissibility of the consular investigator's report on which the IJ had so heavily relied in determining that Dr. Duka's medical report was fraudulent. Dokaj further argued that the IJ should have given greater weight to Dr. Duka's July 30, 2003 declaration validating the March 7,

6

2001 medical report and to Dokaj's testimony. On May 23, 2005, the BIA adopted and affirmed the IJ's decision. The BIA noted that the IJ's decision was based on an adverse credibility determination and a determination that Dokaj was ineligible for asylum, withholding of removal, and CAT protection. The BIA also found that the IJ had not abused his discretion in admitting the consular investigator's report and had not erred in giving it significant evidentiary weight.

Dokaj then filed this petition for review. On appeal, he argues that the BIA should have precluded consideration of the consular investigator's report and remanded the case to the IJ for further proceedings.

## C.

This court must uphold the decision of the IJ, as adopted by the BIA, if it was supported by substantial evidence. *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004). Under the substantial evidence standard, the decision must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). The decision can be reversed only if the evidence compels a conclusion to the contrary. *Id. See also* 8 U.S.C. § 1252(b)(4)(B) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). Credibility determinations are considered findings of fact and are also reviewed under the substantial evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Evidentiary rulings, however, are reviewed "only to determine whether such rulings have resulted in a violation of due process," *i.e.,* whether "the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005).

7

**D.**

As Respondent points out, the IJ's decision, as adopted by the BIA, was based on alternative grounds. The IJ held that Dokaj's claims were not credible. The IJ also held that even if they were credible, Dokaj had nevertheless failed to establish eligibility for asylum, withholding of removal, or protection under CAT.

On appeal, Dokaj has challenged only the adverse credibility determination and, in particular, the IJ's reliance on the consular investigator's report. Because Dokaj has not challenged the IJ's alternative, independent finding that he is ineligible for asylum, withholding of removal, or protection under CAT, we would be justified in summarily denying his petition. *See Rreshpja v. Gonzales*, 420 F.3d 551, 556-57 (6th Cir. 2005) (finding no need to review adverse credibility determination where petitioner had not established eligibility for asylum). We will nevertheless address the issues raised in the parties' briefs concerning the adverse credibility determination.

**E.**

In connection with the adverse credibility determination, Dokaj first challenges the admissibility of the consular investigator's report. As noted above, this court reviews evidentiary rulings "only to determine whether such rulings have resulted in a violation of due process." *Hassan*, 403 F.3d at 435. Dokaj, however, has not argued that admitting the consular investigator's report resulted in a due process violation. On appeal to the BIA, he argued only that the IJ violated local court procedures by allowing the Government to submit the report less than 14 days before the hearing. He also objected to the fact the Government submitted a copy of

8

the report rather than the original.

Dokaj has not established that admission of the untimely report violated his due process rights. At his attorney's request, he was given 14 days after the hearing to submit additional evidence to rebut the allegations of fraud. Dokaj did present additional evidence in the form of a supplemental declaration by Dr. Duka. Although the IJ ultimately gave greater weight to the consular investigator's report, he did consider the supplemental declaration. Furthermore, Dokaj has not shown how he was prejudiced by the Government's failure to produce an original document as opposed to a copy. The BIA found no abuse of discretion in the IJ's decision to admit the consular investigator's report. Under the circumstances presented here, the court finds that admitting the report did not violate Dokaj's due process rights.

Dokaj also challenges the weight the IJ gave to the consular investigator's report. He argues that the consular investigator's report was flawed for several reasons, but none of his alleged reasons has any merit. For example, he contends that although the consular investigator concluded that Duka's report was "not valid," the investigator fails to explain why. It is clear from the context of the investigator's report, however, that the only reason the investigator concluded that the medical report was not valid was that Duka expressly denied issuing it. Dokaj also notes that the investigator spoke to *Mr.* Duka rather than *Dr.* Duka, and that Mr. Duka was allegedly employed by the "coroner service." Any doubt about whether the consular investigator contacted the wrong person or the wrong agency, however, is dispelled by Dr. Duka's July 30, 2003 supplemental declaration in which he acknowledges that he was, in fact, contacted by an investigator from the embassy concerning the validity of the March 7, 2001 medical report.

Dokaj also argues that the IJ's credibility analysis "begins and ends" with this allegedly

9

flawed consular investigator's report. While the IJ did find that submission of the fraudulent medical document undermined Dokaj's entire claim, the IJ's adverse credibility determination was also based on numerous other findings, including: (1) the fact that Dokaj had failed to submit any corroborating evidence from family members concerning the incidents in question, even though that evidence appeared to be readily available; (2) the fact that there were some inconsistencies in the record concerning the date on which Dokaj was allegedly arrested and beaten and seen by Dr. Duka; and (3) the State Department reports indicating that medical reports from Albanian doctors were rarely reliable and were often forged. In addition, as Respondent correctly points out, Dokaj's own description of the injuries he allegedly sustained on November 25, 2000 is not entirely consistent with the injuries reportedly observed by Dr. Duka.

The BIA found no clear error in the IJ's reliance on the consular investigator's report with respect to the adverse credibility determination. The BIA noted that "[t]he report was prepared by authorities of this country, and was properly given significant weight notwithstanding the respondent's evidence to the contrary." This court likewise finds that the IJ's adverse credibility determination, as adopted by the BIA, was supported by substantial evidence. The record does not compel a contrary conclusion.

## F.

As noted above, Dokaj has not challenged the IJ's finding that he is ineligible for asylum, withholding of removal, or CAT protection. Furthermore, for the reasons stated above, this court finds that the IJ's adverse credibility determination, as adopted by the BIA, is supported by substantial evidence. The court also finds that admission of the consular investigator's report did not result in a denial of due process. The court therefore DENIES the petition for review.

10