[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 8, 2011
JOHN LEY
CLERK

_____

No. 09-16384

_____

Agency No. A099-280-328

NDEYE NDICKE SECK,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(December 8, 2011)

Before TJOFLAT, WILSON and SEYMOUR,* Circuit Judges.

SEYMOUR, Circuit Judge:

_____

* Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Ms. Ndeye Ndicke Seck, a native and citizen of Senegal, petitions for review of the Board of Immigration Appeals' ("BIA's") final order, which affirmed an Immigration Judge's decision to deny her application for withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3). Ms. Seck claims that if she returns to Senegal, it is more likely than not that she will be beaten or killed for attempting to protect her U.S. citizen daughter, B.D., from being subjected to female genital mutilation.

We grant the petition for review because the BIA failed to give reasoned consideration to Ms. Seck's application when it found she could relocate within Senegal to avoid persecution. We vacate the BIA's decision with regard to Ms. Seck's application for withholding of removal and remand for proceedings consistent with this opinion.

## I.

### A.

Female genital mutilation ("FGM") is a general term used to describe several types of procedures involving the removal of some or all of the external genitalia, which is performed on girls and women primarily in Africa and Asia. *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004).

The Department of State has classified, based on World Health Organization typology, the prevalent forms of female genital mutilation. Type I, commonly referred to as "clitoridectomy," is the removal of the clitoral hood with or without removal of all or part of the clitoris. Type II, commonly referred to as "excision," is the removal of the clitoris together with part or all of the labia minora. Type III, commonly referred to as "infibulation," is the removal of part or all of the external genitalia (clitoris, labia minora and labia majora) and stitching or narrowing of the vaginal opening, leaving a very small opening, about the size of a matchstick, to allow for the flow of urine and menstrual blood.

*Id.* at 638 n.1. According to the State Department, Type II and Type III are both practiced by groups in Senegal. U.S. Dep't of State, *Senegal: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC)* (June 1, 2001) (hereinafter "*Report on FGM*"), Rec. at 165.[1] These Senegalese groups believe that the Quran requires women to undergo FGM. "It is generally performed by women of the blacksmith's caste . . . without the use of anesthesia." *Id.*

The risks and effects of FGM are well documented. It exposes the victim to risks of "serious, potentially life-threatening complications," including "bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus." *In re Kasinga*, 21 I. & N. Dec. 357, 361 (BIA 1996). In

---

[1] Although the State Department's *Report on FGM* states that Type II is commonly practiced in Senegal, it describes Type II as "the excision (removal) of the clitoral hood with or without removal of all or part of the clitoris." *Report on FGM*, Rec. at 165. As stated, this procedure is more typically classified as Type I. *See Abay*, 368 F.3d at 638 n.1. Our analysis of Ms. Seck's petition is the same regardless of whether clitoridectomies or excisions are more commonly practiced in Senegal.

addition to permanently disfiguring the victim's genitalia, it "can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions." *Id.*

In September 2000, Ms. Seck was admitted to the United States as a tourist. During her stay, she gave birth to her daughter, B.D. Two months later Ms. Seck returned to Senegal with B.D. Although Ms. Seck is a member of the Lebou ethnic group, B.D. is a member of her father's ethnic or tribal group, the Toucouleur.[2] The Lebous do not practice any form of FGM, but the Toucouleur perform FGM on their girls, typically beginning at around age three.

In 2002, Ms. Seck lived in Dakar, Senegal's capital and largest city, where she worked for an airline. She returned home from work one day and discovered that B.D.'s paternal aunt had taken B.D. without Ms. Seck's permission. She immediately drove to the aunt's house, which was approximately thirty or forty minutes away. The aunt and her family tried to convince Ms. Seck to let them keep B.D. for the weekend, but Ms. Seck refused. She feared that if she allowed B.D. to stay, they would subject her to FGM. B.D. was approaching the age at which girls in the tribe are subjected to FGM, and all of her female cousins had

---

[2] The record uses various terms for B.D.'s ethnic group including Toucouleur, Haalpulaaren (or Halpularen), and Pulaar. To avoid confusion, we use "Toucouleur" throughout the opinion.

already undergone FGM. In addition, B.D.'s father's family had begun to talk about and plan for performing FGM on her. Ms. Seck realized that B.D.'s father's family or his tribe could take B.D. "at any time," and that Ms. Seck "would be essentially powerless to stop them" from performing FGM on her daughter. Rec. at 251.

A few months later, in July 2002, Ms. Seck and her daughter left Senegal and entered the United States. She subsequently had two sons in the United States by B.D.'s father.

In January 2007, the Department of Homeland Security (formerly the Immigration and Naturalization Service) served Ms. Seck with a Notice to Appear, charging her as removable pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). After securing counsel, she appeared before an Immigration Judge ("IJ"), admitted to the factual allegations contained in the Notice to Appear, and conceded removability.

In September 2007, Ms. Seck filed an application seeking asylum and withholding of removal under the INA and relief under the Convention Against Torture ("CAT"). She asserted that if the government removes her to Senegal, she will be forced to take B.D. with her. She explained that if they return to Senegal, she believes B.D. will be subjected to female genital mutilation and Ms. Seck will

be beaten or killed when she tries to prevent the procedure.

During the asylum hearing before the IJ, Ms. Seck testified about the circumstances that led her to leave Senegal with B.D. In addition to the incident with B.D.'s paternal aunt, Ms. Seck explained that her sister, Awa, has a Toucouleur daughter. Although Awa is opposed to FGM, her daughter was subjected to the procedure at age five without Awa's knowledge. Awa's ex-husband took their daughter to a birthday party and left her there for the weekend. When the little girl returned, Awa discovered FGM had been performed on her.

Ms. Seck produced a written declaration from Awa and a medical certificate corroborating that Awa's daughter was subjected to FGM. Awa's declaration indicated that she lives in the Dakar region. Awa declared that she lives near B.D.'s father's family and knows them very well. According to Awa, the family of B.D.'s father will do anything to perform FGM on her. Awa explained that if Ms. Seck and B.D. return to Senegal, "they will be in perpetual danger," and B.D. "surely" will be subjected to FGM. Rec. at 199. In her judgment, Ms. Seck will be unable to protect B.D. and will be "threaten[ed], beaten, insulted, or killed" for trying to do so. *Id.*

Ms. Seck testified that if she is required to return to Senegal, she will take her children with her because she does not know anyone in the United States who

6

would care for them.  She does not have any family members in this country, and she does not know where her children's father is, although she believes he is still in the United States.  Moreover, she believes her children's father would allow his family to perform FGM on B.D., either by sending B.D. to Senegal or by permitting his family members to come to the United States to perform the procedure.  Ms. Seck's attorney indicated that if the father is still in the United States, he is presumably here illegally.

Ms. Seck testified that she would not be safe anywhere in Senegal.  This is so because B.D. is recognizable as Toucouleur due to her name and skin color, and the Toucouleur are everywhere.  In addition, B.D.'s father's family continues to be in touch with Awa, and have said "they're waiting for [B.D.], that she's going to come back, they're going to do it [FGM] to her."  *Id.* at 133.  When asked what would happen if she tried to protect B.D. and prevent FGM, she explained:

> They might, they might persecute me.  They might beat me or kill me.  Because they consider that myself, I'm not a human being, because I was not circumcised; I'm impure.  So, they don't want [B.D.] to be like me.  They will do their best to get to her, because she is – they consider that she is part of them.  She is supposed to be pure like her father's cousins.

*Id.* at 132.  Although Ms. Seck personally does not know anyone who has been harmed by trying to prevent FGM, she knows of an activist who was murdered

7

after attempting to stop the practice in Senegal.

Ms. Seck also provided letters from friends explaining that all of the women on B.D.'s father's side of the family have undergone FGM, that FGM is inevitable for B.D., and that Ms. Seck will be risking her life if she returns to Senegal. A Senegalese friend of Ms. Seck's wrote, "Many women have been beaten, almost to death, for talking publicly [about FGM]." *Id.* at 220–21.

After the government cross-examined Ms. Seck, the IJ admitted on his own motion the *Report on FGM* referenced above, the U.S. Department of State, *Senegal, 2007 Country Reports on Human Rights Practices* (Mar. 11, 2008) (hereinafter "*Country Report*"), and the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor, *Senegal – Profile of Asylum Claims & Country Conditions* (June 1998) (hereinafter "*Senegal Profile*"). According to these reports, approximately twenty percent of the female population of Senegal has undergone FGM. Forty percent of previously-practicing communities in Senegal have stopped performing FGM. The Toucouleur, however, continue to perform FGM on girls and "one of the most extreme and dangerous forms of FGM[] was sometimes practiced by the Toucouleur . . . particularly in rural and some urban areas." *Country Report*, Rec. at 188. Among rural Toucouleur, up to 88% of women have been subjected to FGM. Among urban Toucouleur, it is

8

estimated that the rate of FGM is twenty percent. FGM is illegal in Senegal, but it remains "widespread" and is still practiced "openly and with impunity" by many. *Id.* at 177, 188. "Although the government has been actively seeking to eradicate this practice," the State Department reported it was "unaware of any protection in place that might help a woman who wished to avoid it." *Report on FGM*, Rec. at 167.

Ms. Seck next sought to call Mr. Amadou Diallo to testify, but the government objected and claimed he was a surprise witness. At the government's request, Ms. Seck's attorney provided a proffer of Mr. Diallo's testimony:

> Essentially his testimony would be that he met Ms. Seck in the United States; that he was actually not an eye witness to any action in Senegal, but that *he is a member of the [Toucouleur] tribe which widely conducts the practice of female circumcision*; that he has family members that have undergone that practice; that he is familiar with the, with the degree to which they, to which they do so, and *that they persecute people who will not undergo [FGM], as well as their family members*. He knows the things that the respondent has told him. He could recount that as far as the fear that she faces, as far as what her child's father's family members have said in Africa, and basically *can corroborate that that comports with generally known practices in Senegal*.

Rec. at 152 (emphasis added).

In response, the government's attorney stated,

> *[T]he Department is not going to contest that* FGM is conducted in Africa by this tribe in this country, and that *these children* might be

9

subjected to that, or *[will] probably [be] subjected to that, if they were to voluntarily return as United States citizens to that country*. If that's the extent of his testimony, *we would accept the proffer and ask the Court to accept the proffer*.

*Id.* at 153 (emphasis added). The IJ said he would like to question the witness. In response to a question from the IJ, Ms. Seck's attorney said he was willing to rely on the proffer and allow the judge to examine the witness, to which the government agreed.

The IJ asked Mr. Diallo questions about the practice of FGM in Senegal. Mr. Diallo testified that to his knowledge, the rate of FGM among Toucouleur women is one hundred percent. He said that he believes he can only keep his own daughters safe from FGM by keeping them in the United States, where he is a permanent resident.

**B.**

The IJ issued an oral decision in which he denied all relief to Ms. Seck.[3] The IJ found Ms. Seck "to be a relatively credible individual," although he also "suspect[ed] some embellishment of her fear of her daughter being circumcised

---

[3] Ms. Seck does not appeal the denial of her asylum and CAT claims. As a result we only discuss her application for withholding of removal. We note the BIA determined Ms. Seck was time-barred from seeking asylum, *see* 8 U.S.C. § 1158(a)(2); 8 C.F.R. § 1208.4. Even if Ms. Seck had petitioned for our review of the asylum claim, we lack jurisdiction to review the agency's determination of the timeliness of an asylum application. *See* 8 U.S.C. § 1158(a)(3); *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1231 (11th Cir. 2007).

. . . ." Rec. at 85.  With regard to her withholding of removal claim, the IJ explained that under BIA precedent, "an applicant may not establish eligibility for asylum or withholding of removal based on fear that her daughter would be harmed by being forced to undergo female genital mutilation upon returning to her home country." *Id.* at 87 (citing *In re A-K-*, 24 I. & N. Dec. 275 (BIA 2007)).  The IJ recognized, however, that Ms. Seck's claim "goes one step further" and alleges that Ms. Seck herself "would be harmed upon return to Senegal if she attempted to stop the circumcision [of B.D.]" *Id.*

The IJ relied on the *Report on FGM*, the *Senegal Profile*, and the *Country Report* to determine that the rate of FGM in urban areas of Senegal was not sufficiently high for Ms. Seck to establish her claim.  He found, "Considering country conditions as a whole, it does appear to the Court that were respondent to return to Senegal with her daughter and live in a heavily populated urban area, it would not be more likely than not that her daughter would be subjected to female genital mutilation." *Id.* at 88.  As a result, the IJ denied Ms. Seck's application for withholding of removal and ordered her removed to Senegal.

Ms. Seck appealed the IJ's decision to the BIA.  The BIA recognized Ms. Seck's claim that she will be beaten or killed if she tries to prevent B.D. from undergoing FGM.  *See id.* at 20 ("The respondent opposes the practice of FGM

11

and is opposed to the daughter undergoing the procedure, but believes that she will be beaten or killed if she tries to stop it."). It concurred with the IJ's finding that Ms. Seck was credible. It then stated:

> An alien may not establish eligibility for asylum or withholding of removal based solely on fear that his or her daughter will be harmed by being forced to undergo FGM upon returning to the alien's home country.
>
> We also agree with the Immigration Judge that [Ms. Seck] failed to show that internal relocation to another part of the country was not possible to avoid her daughter being subjected to FGM.

*Id.* at 20–21 (citations and footnote omitted). In a footnote, the BIA opined that because B.D. is a U.S. citizen, she could avoid the risk of FGM by remaining in the United States with her father or a guardian, as she is legally entitled to do. *Id.* at 21 n.3 (citing *In re A-K-*, 24 I. & N. Dec. at 277). Accordingly, the BIA dismissed Ms. Seck's appeal.

Ms. Seck filed a petition for review of the BIA's decision in this court. She also filed a motion to reconsider with the BIA. The BIA denied her motion to reconsider after briefing was complete in this appeal, but before oral argument.

## II.

We review only the BIA's decision except to the extent the BIA expressly adopts the IJ's opinion or reasoning. *Najjar v. Ashcroft*, 257 F.3d 1262, 1284

(11th Cir. 2001). Here, the BIA issued its own opinion and relied on the IJ's decision and reasoning without expressly adopting its opinion. We therefore "review the IJ's opinion, to the extent that the BIA found that the IJ's reasons were supported by the record," and we "review the BIA's decision, with regard to those matters on which it rendered its own opinion and reasoning." *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1275 (11th Cir. 2009).

The substantial evidence test applies to the BIA's determination that an alien is statutorily ineligible for withholding of removal. *Najjar*, 257 F.3d at 1283. Pursuant to this test, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (citation and internal quotation marks omitted). We may reverse the BIA's findings of fact "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.*; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . ."). We review

13

questions of law de novo but defer to the BIA's reasonable interpretation of applicable statutes. *Najjar*, 257 F.3d at 1284.

The BIA and the IJ "must consider all evidence introduced by the applicant." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (citation and internal quotation marks omitted); *see also* 8 C.F.R. § 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence . . . ."). Where the BIA "has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Tan*, 446 F.3d at 1374 (citation and internal quotation marks omitted). However, the BIA "must consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* (citation and internal quotation marks omitted).

## III.

To obtain withholding of removal, an applicant must demonstrate that her "life or freedom would be threatened in that country [of removal] because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant bears the burden of showing

14

that she "more-likely-than-not would be persecuted or tortured upon [her] return to the country in question." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003); *see also* 8 C.F.R. § 208.16(b). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof [for withholding of removal] without corroboration." 8 C.F.R. § 208.16(b).

An applicant for withholding of removal may satisfy her burden of proof in one of two ways. First, she may establish past persecution in her country based on a protected ground, which creates a rebuttable presumption that her life or freedom would be threatened in the future in that country. *Id.* § 208.16(b)(1); *Mendoza*, 327 F.3d at 1287; *Tan*, 446 F.3d at 1375. Alternatively, an applicant who has not suffered past persecution may demonstrate that her life or freedom would be threatened in the future in the country of removal based on a protected ground. To do this, the alien must establish "that it is more likely than not that . . . she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country." 8 C.F.R. § 208.16(b)(2); *see also Tan*, 446 F.3d at 1375. "An alien cannot demonstrate that [she] more-likely-than-not would be persecuted on a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of [her] country." *Mendoza*, 327 F.3d at 1287 (citing 8 C.F.R. § 208.16(b)(2)).

15

The BIA has previously held that an alien may not establish eligibility for withholding of removal or asylum solely by alleging a fear that his or her U.S. citizen daughter will be forced to undergo FGM in the alien's home country. *In re A-K-*, 24 I. & N. Dec. at 278–79. Many of our sister circuits have adopted this rule. *See, e.g.*, *Mariko v. Holder*, 632 F.3d 1, 8 (1st Cir. 2011); *Kane v. Holder*, 581 F.3d 231, 240–42 (5th Cir. 2009); *Gumaneh v. Mukasey*, 535 F.3d 785, 789–90 (8th Cir. 2009); *Niang v. Gonzales*, 492 F.3d 505, 513 (4th Cir. 2007); *Oforji v. Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003); *cf. Kone v. Holder*, 596 F.3d 141, 153 (2d Cir. 2010) (observing that such derivative claims appear to be foreclosed in the Second Circuit by *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296 (2d Cir. 2007) (en banc)). *But see Abebe v. Gonzales*, 432 F.3d 1037, 1043 (9th Cir. 2005) (remanding to BIA to address this question in the first instance). We have not decided this question in a published opinion. In *Axmed v. U.S. Attorney General*, 145 F. App'x 669, 675 (11th Cir. 2005), however, we seemed to endorse decisions prohibiting these derivative asylum claims where the daughter has a right to remain in United States.

In addition, the Fourth Circuit has held that "persecution" for purposes of asylum and withholding of removal does not include the psychological harm that a parent would endure if his or her daughter were to be subjected to FGM against

16

his or her will. *See Niang*, 492 F.3d at 511–12 (holding that "because 'persecution' cannot be based on a fear of psychological harm alone," petitioner was ineligible for withholding of removal based on the psychological harm she would suffer if her U.S. citizen daughter were to undergo FGM). The Sixth Circuit reached the opposite conclusion, however, and granted refugee status to a mother seeking asylum based on the psychological harm she would suffer if her daughter, a non-U.S. citizen, underwent FGM in their home country. *See Abay v. Ashcroft*, 368 F.3d 634, 642 (6th Cir. 2004) ("[A] rational factfinder would be compelled to find that Abay's fear of taking her daughter into the lion's den of female genital mutilation in Ethiopia and being forced to witness the pain and suffering of her daughter is well-founded."). Other circuits have also suggested that such psychological suffering and anguish could constitute persecution or torture. *See Kone v. Holder*, 620 F.3d 760, 766 (7th Cir. 2010) (remanding to BIA to consider whether threat of FGM on petitioners' U.S. citizen daughter could constitute direct persecution of her parents under the CAT); *Kone*, 596 F.3d at 152–53 (remanding to BIA to consider whether "the mental anguish of a mother who was herself a victim of genital mutilation who faces the choice of seeing her daughter suffer the same fate, or avoiding that outcome by separation from her child, may qualify" petitioner for "humanitarian asylum" under 8 C.F.R.

17

§ 1208.13(b)(1)(iii)(B)).

We need not decide whether Ms. Seck could establish her eligibility for withholding of removal based on fear that B.D. will be forced to undergo FGM in Senegal or the psychological harm Ms. Seck would endure if this occurs. Unlike the petitioners in the cited cases, Ms. Seck's withholding of removal claim alleges a fear of future persecution and physical harm to herself if she is removed to Senegal. She contends it is more likely than not that she will be beaten or killed in Senegal for attempting to protect B.D. from female genital mutilation.

**A.**

In her petition for review, Ms. Seck first contends the BIA erred because it failed to address her specific argument that she personally would be persecuted if she is removed to Senegal and continues to oppose the practice of FGM. According to Ms. Seck, the BIA evaluated her claim as if she were only seeking asylum out of fear for her daughter, rather than out of a fear for her own safety. The government responds that the BIA sufficiently addressed her claim when it determined she could reasonably relocate within Senegal.

We agree with the government that the BIA's order of removal did in fact acknowledge and address the crux of Ms. Seck's claim. Both the IJ and the BIA explicitly recognized Ms. Seck's argument. The BIA stated, "The respondent

18

opposes the practice of FGM and is opposed to the daughter undergoing the procedure, but believes that she will be beaten or killed if she attempts to stop it." Rec. at 20. Similarly, the IJ recognized that Ms. Seck's claim "goes one step further" than a claim based solely on fear for harm to her daughter. *Id.* at 87. "Not only does she fear harm for her daughter, but she believes that she would be harmed upon return to Senegal if she attempted to stop the circumcision." *Id.* We are satisfied that when the Board determined Ms. Seck could relocate to avoid persecution, it was considering the risks that she would encounter as B.D.'s mother and protector, not merely the risks to B.D.

**B.**

Ms. Seck contends the BIA's determination that she failed to establish eligibility for withholding of removal is not supported by substantial evidence. The government responds that the BIA properly determined Ms. Seck is ineligible for withholding of removal because she can safely relocate to an urban area within Senegal.[4]

---

[4] The government claims Ms. Seck waived her challenge to the BIA's relocation determination by failing to raise the issue in her opening brief. This argument is meritless. Ms. Seck's second "Issue on Appeal" in her opening brief directly challenges the BIA's relocation finding. *See* Pet'r Br. at 2. Moreover, she dedicates a significant portion of her opening brief to challenging the IJ's findings regarding the likelihood that she will encounter future persecution. The issue clearly has not been waived. *See Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010) (per cuiram) ("[A] claim may remain viable if the core issue is maintained regardless of labels.").

Upon review of the BIA's decision and the administrative record, we conclude the BIA failed to issue a reasoned decision because it ignored substantial evidence that supported Ms. Seck's petition. The BIA relied on the IJ's determination that Ms. Seck failed to meet her burden to show she could not escape persecution by relocating to another part of Senegal. *See* Rec. at 21 ("We also agree with the Immigration Judge that the respondent failed to show that internal relocation to another part of the country was not possible to avoid her daughter being subjected to FGM."). We therefore review the IJ's discussion of the issue. *See Tang*, 578 F.3d at 1275.

The IJ appears to have based his relocation determination entirely on the State Department's *Senegal Profile*, the *Report on FGM*, and "country conditions as a whole." Rec. at 88. He recited information from the 1998 *Senegal Profile* and the 2001 *Report on FGM*, which indicated that between five and twenty percent of females in Senegal have undergone FGM. The IJ then stated, "Five to twenty percent would fall far short of a clear probability of persecution." *Id.* at 87. After listing several Senegalese groups that do not practice FGM, the IJ noted, "While the majority of [Toucouleur] in rural areas of eastern and southern Senegal continue to practice one form or another of female circumcision, 'the practice is less common among urban.' Estimates on the urban rate is at less than 20

20

percent." *Id.* at 88 (quoting *Report on FGM*, Rec. at 165). Based on these facts, the IJ determined that if Ms. Seck and B.D. lived in a "heavily populated urban area, it would not be more likely than not that her daughter would be subjected to female genital mutilation." *Id.* The IJ did not specifically mention the rate of FGM among rural Toucouleur, which the State Department estimated to be up to 88%.

Neither the BIA nor the IJ discussed the undisputed evidence of specific family conditions that place B.D. and her mother in greater danger than what is reflected by the general statistics of the State Department reports. According to Ms. Seck's credible testimony and corroborating documents in the record, B.D.'s cousin underwent FGM against her mother Awa's will. All of the women in B.D.'s father's family have undergone FGM. B.D.'s father's family has repeatedly and continually expressed its intent to perform FGM on B.D. Although the IJ believed that an urban area of Senegal would provide refuge for Ms. Seck and B.D., the record indicates that B.D.'s father's family lives in the Dakar area and remains in touch with Ms. Seck's sister, Awa. As a result, there is evidence that even the "heavily populated urban area" of Dakar offers no safe haven for B.D.

Notably, none of the credible testimony or corroborating documents offered by Ms. Seck contradicts, or is contradicted by, the information in the State

Department's reports.  To the contrary, those reports corroborate Ms. Seck's testimony that a significant proportion of Toucouleur continue the practice of FGM, despite laws banning the practice.  Inevitably, individual Toucouleur girls in Senegal will have a higher or lower risk of undergoing FGM depending on their specific circumstances.  The rate of FGM among urban Toucouleur may be twenty percent, but undisputed evidence in the record indicates that B.D.'s risk of FGM – and Ms. Seck's risk of persecution – is much higher than that, particularly in the Dakar area.  Even the government's attorney stated it wasn't contesting that B.D. would "probably [be] subjected to" FGM if Ms. Seck and B.D. return to Senegal.[5] *Id.* at 153.  Notwithstanding this evidence, the IJ discussed only the general country conditions, without addressing Ms. Seck's credible evidence that indicates B.D. faces a greater risk than that reflected in the State Department's reports.  There is simply no indication that the IJ gave any consideration to B.D. and Ms. Seck's specific situation.[6]

---

[5] Ms. Seck characterizes this statement as a stipulation by the government that B.D. will more-likely-than-not be subjected to FGM if they return to anywhere in Senegal.  In the government's response, it does not challenge this characterization but instead argues that substantial evidence supports the IJ's rejection of the stipulation.  *See* Resp't Br. at 6, 20–21; *see also* Resp't 28(j) Notice of Supplemental Authority (Mar. 28, 2011) (quoting *Loftin & Woodward, Inc. v. United States*, 577 F.2d 1206, 1232–33 (5th Cir. 1978)).

[6] The likelihood B.D. will actually undergo FGM is not a precise measure of the likelihood that Ms. Seck will be persecuted for protecting B.D.  For example, Ms. Seck's risk of persecution may be higher because she could be injured or killed when protecting B.D. from unsuccessful attempts to perform FGM on B.D.  Alternatively, Ms. Seck's risk of persecution

22

The BIA's decision adds no analysis to show it considered the evidence submitted by Ms. Seck. The BIA only discussed the circumstances that caused Ms. Seck to leave Senegal with B.D. It did not address the evidence that places B.D. at greater risk of FGM if she returns.

The BIA was "entitled to rely heavily on" the State Department's reports about conditions in Senegal. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004); *see also Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009) (same). "However, '[u]se of country reports cannot substitute for an analysis of the unique facts of each applicant's case.'" *Imelda v. U.S. Att'y Gen.*, 611 F.3d 724, 729 (11th Cir. 2010) (quoting *Gitimu v. Holder*, 581 F.3d 769, 773 (8th Cir. 2009)). General information about the conditions in a given country "are only useful to the extent that they comment upon or are relevant to the highly specific question of whether *this individual*" has suffered or is likely to suffer persecution in a country. *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1280 (11th Cir. 2009) (citation omitted). The BIA must engage in an individualized analysis of the applicant's specific situation. *See Imelda*, 611 F.3d

could be lower if B.D.'s family finds a way to perform FGM on B.D. without Ms. Seck's knowledge. Nonetheless, B.D.'s risk of FGM provides a rough estimate of the risk that Ms. Seck faces if she returns to Senegal with B.D. To the extent that these two probabilities differ, however, this is a factual determination that the agency should consider in the first instance on remand. *See INS v. Ventura*, 537 U.S. 12, 16, 123 S. Ct. 353, 355 (2002) (per curiam).

at 729. The IJ and the BIA may not rely entirely on State Department reports while failing to consider the credible, specific evidence that B.D.'s risk of FGM is higher than the general population, particularly in Dakar.

"Although the [BIA] is not required to discuss every piece of evidence presented . . . the [BIA] is required to consider all the evidence submitted by the applicant." *Tan*, 446 F.3d at 1376. "[A] remand is necessary when the record suggests that the Board failed to consider important evidence in that record." *Kazemzadeh*, 577 F.3d at 1355 (citing *Tan*, 446 F.3d at 1374). Here, the record plainly suggests the Board failed to consider important evidence regarding B.D.'s risk of FGM and Ms. Seck's consequent risk of protecting her. "Because the findings of the [BIA and] the Immigration Judge are inadequate, we are unable to review the denial" of Ms. Seck's petition for withholding of removal. *Tan*, 446 F.3d at 1377; *see also Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1238 (11th Cir. 2007) (remanding because "the IJ failed to render a reasoned decision . . . and [did] not appear to have considered evidence in the record"). We therefore remand to the agency for it to consider the entire record in evaluating Ms. Seck's petition.

We do not reach the question of whether Ms. Seck, as a mother who opposes the practice of FGM on her daughter, falls within a "particular social

24

group" for purposes of withholding of removal.  *See* 8 U.S.C. § 1231(b)(3)(A).

This question was not reached by the BIA, and it is most appropriately considered

by the agency in the first instance.  *See Gonzales v. Thomas*, 547 U.S. 183,

186–87, 126 S. Ct. 1613, 1614–15 (2006) (per curiam) (holding it was improper

for Ninth Circuit to determine that an alien's family constituted a "particular social

group" for asylum purposes because proper course was to remand issue to Board

for initial determination).  Upon remand, the BIA should address this issue if

necessary.

## C.

Ms. Seck raises other theories on appeal.  She contends her removal to

Senegal would constructively deport B.D. as well.[7]  She also asks us to remand

"for consideration of whether being forced to abandon a child, in order to protect

her from [FGM], constitutes the imposition of harm rising to the level [of]

persecution."  Pet'r Br. at 30.  Because these claims were not raised before the

BIA, we lack jurisdiction to consider them.  *See* 8 U.S.C. § 1252(d)(1); *Amaya-*

---

[7] Ms. Seck has stated that she would take her children with her to Senegal if she is forced to return there.  Although the BIA noted that B.D., as a U.S. citizen, has a legal right to remain in the United States even if her mother is forced to leave this country, it does not appear to have relied on this fact in its determination of Ms. Seck's application for withholding of removal. Similarly, the government does not argue that this is an alternative basis for denying Ms. Seck's petition for review.  Consequently, we do not consider what effect, if any, B.D.'s citizenship, or the unknown whereabouts and presumably undocumented status of B.D.'s father, has on Ms. Seck's petition.

*Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam) ("We lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted his administrative remedies with respect thereto.").

## IV.

We GRANT Ms. Seck's petition for review of the denial of her application for withholding of removal. We VACATE IN PART the decision of the BIA addressing her claim and REMAND for proceedings consistent with this opinion.