[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12382
Non-Argument Calendar
_____

Agency No. A202-028-326

ILIANA GUADALUPE ALONZO-RIVERA,
a.k.a. Iliana Guadalupe Alonza-Rivera,
DANIELA ESTER PARADEZ-ALONZO,
a.k.a. Daniela Ester Paredez-Alonzo,
EMELY RAQUEL PAREDEZ-ALONZO,
a.k.a. Raquel Emely Paredez-Alonzo,

                                                              Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                              Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(May 20, 2016)

Before JORDAN, JULIE CARNES and FAY, Circuit Judges.

PER CURIAM:

Lead petitioner Iliana Guadalupe Alonzo-Rivera and her daughters, Daniela Ester and Emely Raquel Paredes Alonzo petition for review of the Board of Immigration Appeals ("BIA") dismissal of denial by the Immigration Judge ("IJ") of Alonzo-Rivera's application for asylum pursuant to the Immigration and Nationality Act ("INA"), § 208(a), 8 U.S.C. § 1158(a), withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).  We grant their petition in part and deny in part.

## II.  BACKGROUND

Alonzo-Rivera, a native and citizen of Honduras, was served with a Notice to Appear ("NTA") on June 28, 2014, and charged as removable under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled.  At the master-calendar hearing on October 23, 2014, Alonzo-Rivera's counsel admitted the allegations in the NTA and conceded removability.  Alonzo-Rivera filed an I-589 application for asylum, withholding of removal, and CAT relief on December 2, 2014, and listed Daniela and Emely as derivative beneficiaries.  In her application, Alonzo-Rivera stated she

2

was seeking asylum, based on the domestic abuse she had suffered at the hands of her ex-husband, Daniel Paredes.  The IJ scheduled the merits hearing on January 7, 2015.

Alonzo-Rivera subsequently filed a motion to continue the merits hearing to a later date.  The motion requested more time to prepare for the merits hearing, because Alonzo-Rivera lived several hours away from her counsel's office and was unable to secure reliable transportation to meet with her counsel to work on her case.  In addition, her case was fact-intensive, and her counsel would need more time to prepare exhibits and other materials for the hearing.  Both counsel and Alonzo-Rivera submitted supporting affidavits attesting to their logistical difficulties in meeting to work on Alonzo-Rivera's case; the need for additional time to collect evidence; and the need for additional time for Alonzo-Rivera to seek counsel so she would be better able to testify about the abuse she had suffered.  The IJ granted the motion to continue in part and rescheduled the merits hearing for January 14, 2015.

Alonzo-Rivera filed a pre-hearing brief in support of her application and argued she was entitled to asylum based on past persecution.  She contended Paredes's abuse rose to the level of persecution contemplated by the INA and asserted she was a member of a particular social group, defined as "formerly married Honduran women who are unable to leave their relationship."  R. at 496-

3

500.  Furthermore, she was persecuted based on her membership in that group, and the Honduran government was unwilling or unable to protect her.  Finally, she insisted she also was entitled to withholding of removal or CAT relief.

Alonzo-Rivera filed a number of exhibits in support of her application, including: (1) her personal declaration; (2) the 2013 State Department Country Report for Honduras ("Country Report"); (3) the declaration of Claudia Herrmannsdorfer, a Honduran attorney specializing in violence against women; (4) reports related to crime, impunity, and violence against women in Honduras; (5) a certification from the Supreme Court of Justice Special Tribunal for Domestic Violence in San Pedro Sula, Cortes, Honduras (the "Special Tribunal"), confirming Alonzo-Rivera had filed a domestic-violence complaint against Paredes on January 7, 2014; and (6) appointment notices from the Special Tribunal showing Alonzo-Rivera had three appointments between January 30 and February 17, 2014.

In her declaration, Alonzo-Rivera stated she was applying for asylum because she feared Paredes would beat, rape, or kill her if she returned to Honduras.  Alonzo-Rivera grew up in San Pedro Sula, Honduras, and lost confidence in the police as a child, while living in a neighborhood known for gang violence.  It appeared to her the police were complicit with gang activities, and terrible things happened in the neighborhood despite the presence of a police station.

4

In 2001, Alonzo-Rivera met Paredes.  During their courtship, Paredes was considerate and treated Alonzo-Rivera well.  They married in 2003, and approximately six months after the marriage, three of Paredes's siblings moved in with them, including his brother Danilo.  Paredes's behavior toward Alonzo-Rivera changed, and he began to humiliate her in front of his siblings.  When their first daughter, Daniela, was born in 2005, the relationship improved for a period of time.  The couple began fighting again, because Alonzo-Rivera was upset Danilo continued to live with them, when the other two siblings had moved away.  Danilo eventually moved, but Alonzo-Rivera and Paredes's relationship continued to deteriorate.  Paredes told Alonzo-Rivera she was useless and would not let her manage the family's money, so Alonzo-Rivera had to lie to Paredes about how much money she made to prevent him from taking her entire salary.

In 2008, Alonzo-Rivera lost her job; she and Paredes moved into her mother's house.  Alonzo-Rivera's mother moved in with Alonzo-Rivera's sister, who lived next door.  Around that time, Alonzo-Rivera told her mother about Paredes's mistreatment and that she was afraid of him.  Paredes raped Alonzo-Rivera for the first time approximately one month after the move.  He told Alonzo-Rivera he could do whatever he wanted with her, because she was his wife.  Paredes also began hitting Alonzo-Rivera; on one occasion, he attempted to suffocate her with a pillow.  Alonzo-Rivera told her mother about the attempted

5

smothering, but they were too afraid to report Paredes to the authorities. When Alonzo-Rivera threatened to report Paredes, he told her nobody would believe her.

Paredes continued to rape Alonzo-Rivera, and she became pregnant with their second daughter, Emely, in 2009. Paredes was angry about the pregnancy and moved out of the house. Alonzo-Rivera asked Paredes to consent to a divorce, because she could not afford to seek a divorce without his consent, but Paredes refused. Paredes later agreed to a divorce in 2013, after he had impregnated another woman. Alonzo-Rivera was awarded custody of their two daughters but did not tell the judge in the divorce proceeding about Paredes's abuse, because she was afraid of Paredes. After the divorce, Paredes continued to come by Alonzo-Rivera's house unannounced and threatened to kill her if he ever found out she was with another man. He also continued to demand sex from Alonzo-Rivera; when she refused, he told her he had every right, because she was the mother of his daughters.

In 2013, Danilo began staying at Alonzo-Rivera's house without her permission. Paredes had told Danilo he could stay with her to keep an eye on her. While living with her, Danilo raped Alonzo-Rivera, and she became pregnant. Alonzo-Rivera feared Paredes would kill her if he discovered she was pregnant and moved in with her friend Celia Ventura, who encouraged her to file a complaint against Paredes. Alonzo-Rivera stated she did not report Paredes's abuse

6

previously, because she was afraid of him; she did not trust the police, and Paredes

had told her no one would believe her if she tried to report him.

Alonzo-Rivera filed a complaint against Paredes on January 7, 2014, with

"an institution called: D.V. Domestic Violence," which was supposed to help

women who had been mistreated. R. at 262. They subpoenaed Alonzo-Rivera and

Paredes three or four times. Paredes did not appear for the first two appointments,

but he did attend the third appointment. They told Paredes if he continued

threatening Alonzo-Rivera, they would issue an order barring him from going to

her house and would punish him by "sending him to sweep the streets." R. at 262.

Immediately after the appointment, Paredes threatened Alonzo-Rivera and told her

she would pay for bringing him there. Alonzo-Rivera went back inside and told

someone Paredes had threatened her, but the person told her not to worry. Alonzo-

Rivera asked for a restraining order, but the person refused and said she had to

provide proof of physical abuse.

After that appointment, Paredes left Alonzo-Rivera threatening voicemails

and told her he was going to find her, and she would pay if she kept having him

subpoenaed. He also told her he had someone looking for her, and Alonzo-

Rivera's mother told her Paredes had been to her house looking for Alonzo-Rivera.

At the next appointment, Alonzo-Rivera told the people at Domestic Violence to

close the case, because they were not going to help her. Alonzo-Rivera then

decided to leave the country with her daughters.  Their first attempt was unsuccessful, but they made it to Mexico on their second attempt.  They stayed in Mexico for some time but left for the United States after Alonzo-Rivera learned Paredes had threatened her brother into revealing where she was living in Mexico.  Alonzo-Rivera asserted she would not be able to live safely in another part of Honduras, because Paredes was willing to find her wherever she went.  She further explained Paredes had a friend in the police department.  He previously had threatened, if she left Honduras with their daughters and later returned, he would be able to track her through her fingerprints and identity card.

The 2013 Country Report stated "[v]iolence against women and impunity for perpetrators continued to be a serious problem" in Honduras.  R. at 406.  Specifically, the Report noted domestic violence was widespread; in many cases, victims were hesitant to press charges.  Honduran law criminalizes domestic violence and provides a penalty of community service for a first offense and penalties of two to four years of imprisonment for additional offenses.  The law also provides for a sentence of up to three years for violating a restraining order in a domestic-violence case.  The Report further noted the Honduran government operated three domestic-violence shelters but did not provide sufficient funds or resources for the effective operation of those facilities.  The government also operated two consolidated reporting centers, one of which was located in San

8

Pedro Sula, where women could report domestic-violence crimes and seek medical and other services.

In her declaration, Claudia Herrmannsdorfer stated she was an attorney in Honduras and had been practicing in the area of women's rights and domestic violence for the last 20 years. According to Herrmannsdorfer, "Honduran women live in a culture of violence, fear, and repression," because of the culture of "machismo" that pervades the country. R. at 348. Under that cultural norm, women are viewed as the property of their fathers or intimate partners and are considered second-class citizens. Because Honduran men view their wives as property, they believe they can abuse their wives with impunity. Accordingly, domestic violence is commonplace in Honduran society and is viewed as an issue best resolved in the home.

Herrmannsdorfer further explained the police likewise subscribe to the view that women are second-class citizens; they often tell women who seek help they should go home and seek forgiveness or stop disobeying their husbands. Police often view domestic violence as a purely private matter in which they should not intervene and ignore threats made against women. Because of the lack of response to domestic-violence issues, many Honduran women do not report instances of domestic abuse; they believe it would offer no relief and only inflame their abusers.

9

In addition, Herrmannsdorfer explained Honduran laws and institutions are largely ineffective in protecting women because of lack of funding, ignorance of statutory mandates, lack of sensitivity and training, and general unwillingness to apply laws designed to protect women.  Although the Honduran government has an executive-branch department intended to promote women's rights, that department consistently has been underfunded, preventing it from accomplishing its mandate.  Similarly, lack of funding in the local judiciary prevents courts from issuing protective orders under the Law against Domestic Violence.  The Law against Domestic Violence was passed in 1997 and establishes a mechanism for domestic-abuse victims to obtain a protective order against their abusers but does not provide any criminal sanctions.  Before the Law was amended in 2006, virtually no law enforcement or judicial officers complied with its provisions.  Even after the passage of the amendments, authorities "blatantly ignore the issuance of protective measures, and even deliberately conceal the truth to outsiders about how long it takes to issue them."  R. at 359.  Under the Law, women are entitled to immediate protection and a court hearing within 24 hours of making a complaint; however, they generally must wait two to three months to obtain those services.  Furthermore, the specialized domestic-violence courts mandated by the Law are in only two cities, one of which is San Pedro Sula.  These courts are understaffed and unable to adjudicate the number of claims brought before them.

10

A 2014 communiqué by the United Nations Human Rights Council ("UNHRC") Special Rapporteur on violence against women stated violence against women in Honduras was widespread and systematic. The Special Rapporteur further noted "the lack of accountability for violations of human rights of women[] is the norm rather than the exception," and there were high levels of domestic violence. R. at 376. The 1997 adoption of the Law against Domestic Violence and subsequent amendments had not led to an effective legislative response to domestic violence; one 2006 estimate showed the resolution rate for domestic violence cases was 2.55 percent. A number of factors, such as the lack of effective implementation of the laws, gender discrimination in the judicial system, and the failure of authorities to exercise due diligence in prosecuting domestic-violence cases, created an atmosphere of impunity, resulting in a lack of confidence in the justice system. This fostered a culture of nonreporting of violence against women. In addition, Honduras does not have sufficient facilities, such as battered women's shelters, to provide protection and services to victims.

At the merits hearing, Alonzo-Rivera testified about the events described in her declaration. During her testimony, confusion arose concerning whether Alonzo-Rivera had sought assistance from a domestic-violence organization separate from the Special Tribunal in which she filed her complaint and whether certain interactions she described occurred with representatives from the

11

organization or the Tribunal. Alonzo-Rivera expressed uncertainty at times but ultimately testified she thought the organization and the Tribunal were separate entities.

In an oral decision, the IJ denied Alonzo-Rivera's application and ordered her removed to Honduras. The IJ found various aspects of Alonzo-Rivera's testimony "somewhat implausible," including her testimony concerning her domestic-violence complaint and interactions with the domestic-violence organization. R. at 80. The IJ explained, under the REAL ID Act, Alonzo-Rivera was required to provide a credible, consistent, and plausible account of her claim as well as reasonably available corroborating evidence. The IJ did not question the sincerity of Alonzo-Rivera's testimony but nevertheless noted the implausibilities in her account required corroborating evidence, which she had failed to provide. Moreover, Alonzo-Rivera had not explained reasonably why she could not obtain the necessary corroborating evidence, especially considering she had been able to obtain other evidence from Honduras. Therefore, the IJ concluded Alonzo-Rivera failed to meet her threshold burden of proof, and her application was denied on that basis.

The IJ also denied Alonzo-Rivera's application on the merits and stated she had not demonstrated she belonged to the particular social group she identified, because she was in fact able to leave the relationship with Paredes. In addition, she

12

did not show she filed police reports concerning the abuse or that the police would have been unwilling or unable to help her. The IJ noted, for example, when she was in the divorce tribunal, Alonzo-Rivera "chose not to mention the incidents of abuse" and was advised to contact an organization to help her with her domestic-abuse claim but chose not to pursue that advice. R. at 84-85. Because she had failed to satisfy the lower burden of proof required for asylum, the IJ found she had not established eligibility for withholding of removal. Finally, the IJ found Alonzo-Rivera also had not demonstrated eligibility for CAT relief, because she had "not shown that any public official or that anyone acting with the acquiescence or consent of public officials would seek to harm her, much less torture her." R. at 86.

Alonzo-Rivera appealed to the BIA. She argued her testimony had to be accepted as true on appeal, because the IJ never made an explicit adverse credibility finding. She further contended the IJ findings that portions of her testimony were implausible were based on speculation and should be reversed. She also contended the IJ finding that Alonzo-Rivera failed to meet her burden of proof by not providing sufficient corroborating evidence was clearly erroneous. Alonzo-Rivera argued her testimony was credible, consistent, and detailed; therefore, corroborating evidence was not required. Even if such evidence was required, it was not reasonably available; the IJ had placed undue weight on the

13

absence of certain evidence while ignoring other evidence in the record.  Alonzo-Rivera explained her testimony about the domestic-violence organization actually referred to the Special Tribunal; she did not seek help from any independent domestic-violence organization.

Alonzo-Rivera also argued the IJ had erred in denying her asylum claim on the merits and asserted the harm she had suffered rose to the level of past persecution; she had established her membership in the proposed particular social group.  Moreover, the evidence demonstrated the Honduran government was unwilling or unable to protect her from Paredes.  In addition, Alonzo-Rivera asserted she had established her eligibility for withholding of removal or CAT relief.  Finally, she contended the IJ had deprived her of her right to effective assistance of counsel and a fundamentally fair hearing by scheduling the merits hearing only 35 days after she had filed her I-589 and failing to grant her a longer continuance to seek counsel.

The BIA dismissed Alonzo-Rivera's appeal.  The BIA found Alonzo-Rivera was not denied due process and noted she had been represented by counsel since October 23, 2014, and had ample time to prepare for the merits hearing. Furthermore, she had not provided any additional documents to support her asylum claim; therefore, she had not shown she was prejudiced or treated unfairly by the IJ.  The BIA agreed Alonzo-Rivera had not established her eligibility for asylum,

14

because she had failed to show Honduran authorities were unwilling or unable to protect her from Paredes. The BIA noted Alonzo-Rivera never reported Paredes's abuse to the police and did not notify her legal representative or the court in her divorce proceedings of the abuse. In addition, "after consulting with an organization which provides support to victims of domestic violence," Alonzo-Rivera filed a complaint against Paredes; the court warned him about mistreating her, but Alonzo-Rivera later withdrew the complaint. R. at 4. Therefore, the BIA concluded Alonzo-Rivera's fear the Honduran government would not or could not protect her was based on speculation and unsupported by the evidence in the record. The BIA further found the objective evidence showed the Honduran government had implemented some measures to assist domestic-violence victims, demonstrated by Alonzo-Rivera's ability to file a complaint against Paredes. Furthermore, the BIA noted Alonzo-Rivera never had provided Honduran authorities the opportunity to protect her, because she had withdrawn her complaint before the court could take any action.

The BIA also agreed with the IJ's finding Alonzo-Rivera had failed to provide sufficient corroborating evidence. The BIA noted "[o]ther than the respondent's testimony, which the [IJ] deemed to be at times implausible, there is no evidence in the record to show that the respondent had sought assistance or had been denied assistance by the domestic violence organization." R. at 4. Moreover,

15

the IJ found Alonzo-Rivera's testimony the domestic-violence organization was reluctant to assist her was inconsistent with the purpose and goals of such an organization. The BIA additionally noted Alonzo-Rivera did not provide letters from either her mother or Ventura in support of her asylum claim, despite her testimony that both of them were aware of Paredes's abuse. The BIA determined Alonzo-Rivera had not shown she could not reasonably obtain letters from the domestic-violence organization, her mother, or Ventura to corroborate her claims. Finally, the BIA decided the record supported the IJ's conclusion Alonzo-Rivera did not demonstrate her eligibility for CAT relief, because she did not show she likely would be tortured "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity upon removal to Honduras." R. at 5 (internal quotation marks omitted).

## II. DISCUSSION

### A. Willingness or Ability of the Honduran Government to Protect Alonzo-Rivera

On appeal, Alonzo-Rivera argues the BIA and IJ findings concerning the Honduran government's willingness and ability to protect her from Paredes are unsupported by substantial evidence. She asserts she was not required to demonstrate she sought protection from local authorities, because the record evidence confirmed it would have been unproductive and potentially dangerous to do so. Furthermore, the fact she was able to file a domestic-violence complaint

16

against Paredes is not dispositive, because the government's apparent willingness to protect domestic-violence victims sheds no light on its ability to protect them.

We review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Where the BIA agrees with the IJ's reasoning, we also will review the IJ's decision. *Id.* Factual determinations are reviewed under the substantial-evidence test. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005). Under the substantial-evidence test, we must affirm the IJ and BIA decisions if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005) (citation and internal quotation marks omitted). "To reverse a factual finding by the BIA, this Court must find not only that the evidence supports a contrary conclusion, but that it compels one." *Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317, 1320 (11th Cir. 2001).

Although the BIA and IJ need not address specifically each piece of evidence the applicant submitted, they must give reasoned consideration to all of the evidence presented. *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1368 (11th Cir. 2011). Where the record suggests the agency failed to consider important evidence, a remand is necessary. *Id.*

17

The Attorney General or Secretary of Homeland Security has the discretion to grant asylum to an alien who meets the definition of a refugee.  INA § 208(b)(1)(A); 8 U.S.C. § 1158(b)(1)(A).  All asylum applications filed after May 11, 2005, are governed by the REAL ID Act of 2005.  *Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1049 n.7 (11th Cir. 2009).  In relevant part, a "refugee" is any person outside the country of her nationality "who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of[] that country because of persecution or a well-founded fear of persecution on account of" a protected ground, such as membership in a particular social group.  INA § 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A).  The asylum applicant bears the burden of proving refugee status.  *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1290 (11th Cir. 2006).

If an asylum applicant alleges persecution by a private actor, she must prove her home country is unable or unwilling to protect her.  *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 950 (11th Cir. 2010).  Although an asylum applicant's failure to report persecution to local authorities is generally fatal to her claim, such failure will be excused where the applicant can demonstrate convincingly it would have been futile to seek assistance from those authorities, because they would have been unable or unwilling to protect her.  *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007).

This record suggests the IJ and BIA failed to consider evidence in the record supporting Alonzo-Rivera's claim the Honduran government was unwilling or unable to protect her from Paredes. In addition to her testimony, Alonzo-Rivera presented objective evidence showing domestic violence is widespread in Honduras, and the Honduran government has not addressed that problem effectively. The 2013 Country Report, the UNHRC Special Rapporteur's communiqué, and Herrmanndorfer's declaration all showed domestic violence is pervasive in Honduras, impunity for perpetrators is common, and the laws and institutions in place to assist domestic violence victims are largely ineffective. Neither the BIA nor the IJ appear to have given reasoned consideration to this evidence; instead, they focused on Alonzo-Rivera's failure to report Paredes's abuse to police or the divorce judge and the withdrawal of her domestic-violence complaint. Consequently, the record shows the BIA and IJ failed to consider important evidence concerning the Honduran government's ability to protect Alonzo-Rivera and whether it would have been futile for her to report Paredes's abuse. *Seck*, 663 F.3d at 1368; *Lopez*, 504 F.3d at 1345. Therefore, remand is necessary to allow the agency to consider the entire record in evaluating Alonzo-Rivera's application. *Seck*, 663 F.3d at 1368-69.

19

### B.     Lack of Corroborating Evidence

Alonzo-Rivera further asserts the BIA and IJ erred in finding that portions of her testimony were implausible, and she failed to provide sufficient corroborating evidence.  She contends her testimony must be accepted as true and plausible on review, because the IJ never made an explicit adverse-credibility finding.  She further asserts she was not required to provide corroborating evidence to support her claims, because her testimony was credible, consistent, and detailed.  Even assuming such evidence were required, it was not reasonably available, and the BIA and IJ erred in failing to afford due consideration to the corroborating evidence she did produce.

We review factual determinations under the substantial-evidence test and affirm the agency decision, unless the record compels a contrary factual finding. *See Forgue*, 401 F.3d at 1286; *Farquharson*, 246 F.3d at 1320.  In the absence of an explicit adverse credibility finding, we accept an asylum applicant's testimony as credible on review.  *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257 (11th Cir. 2007).  An applicant's testimony alone may be sufficient to sustain her burden of proof, but only if the trier of fact is satisfied her testimony is credible, persuasive, and sufficiently specific to demonstrate her status as a refugee.  INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii).  If the trier of fact determines the applicant should provide corroborating evidence for her otherwise credible

20

testimony, the applicant must provide such evidence unless she cannot obtain it reasonably. *Id.* The BIA has held that, where the IJ determines at the merits hearing that specific corroborating evidence should have been submitted, the IJ should provide an opportunity for the applicant to explain why the evidence is unavailable, ensure that explanation is included in the record, and clearly state whether the explanation is sufficient. *Matter of L-A-C-*, 26 I&N Dec. 516, 521-22 (BIA 2015). Furthermore, in deciding whether the applicant has satisfied her burden of proof, the IJ must not place undue weight on the lack of a particular piece of corroborating evidence while overlooking other record evidence that corroborates the applicant's claim. *Id.* at 522. Instead, the IJ should weigh all the evidence and consider the totality of the circumstances in determining whether the burden has been met. *Id.*

The IJ did not make an explicit adverse-credibility determination; consequently, we accept Alonzo-Rivera's testimony as credible. *Mejia*, 498 F.3d at 1257. The IJ found Alonzo-Rivera was required to produce additional corroborating evidence for her otherwise credible testimony, because various aspects of her testimony were "somewhat implausible," but she failed to do so. The BIA agreed with the IJ's finding and noted specifically Alonzo-Rivera had failed to provide corroborating evidence concerning her interactions with the domestic-violence organization and its apparent reluctance to assist her or

21

statements from her mother and Ventura concerning Paredes's abuse.  Regarding

the lack of corroborating statements from Alonzo-Rivera's mother and Ventura,

the IJ never determined this evidence was required; consequently, Alonzo-Rivera

did not have an opportunity to explain why she could not obtain those statements.

*Matter of L-A-C-*, 26 I&N Dec. at 521-22.  Therefore, the BIA erred in relying on

the lack of corroborating evidence from Alonzo-Rivera's mother and Ventura in

finding Alonzo-Rivera failed to meet her burden of proof.  *See id.*  In addition, the

BIA and IJ failed to consider all of the corroborating evidence presented by

Alonzo-Rivera; instead, they focused heavily on the lack of documentation

concerning her interactions with the domestic-violence organization.  Putting aside

the confusion in the record about whether Alonzo-Rivera actually sought help from

such an organization, the agency's failure to weigh all of the evidence and consider

the totality of the circumstances in finding Alonzo-Rivera failed to meet her

burden of proof warrants remand.  *See Seck*, 663 F.3d at 1368; *Matter of L-A-C-*,

26 I&N Dec. at 521-22

## C.    Reviewability of Alonzo-Rivera's CAT Claim

Alonzo-Rivera also contends the BIA and IJ decisions do not allow for

meaningful review of her CAT claim, because they did not specify the reasoning

behind their denial of CAT relief.  Where the agency gave reasoned consideration

to an applicant's petition and made adequate findings, we do not require that the

22

agency specifically address each of the applicant's claims. *Shkambi*, 584 F.3d at 1048. The agency need consider only the issues raised and announce its decision in terms that allow us to conclude the agency "has heard and thought and not merely reacted." *Id.* (citation and internal quotation marks omitted).

To establish a claim for CAT relief, an alien must prove it is more likely than not she will be tortured if removed to her home country. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004). Torture involves the intentional infliction of severe pain or suffering on a person for purposes such as punishment, intimidation, coercion, or discrimination, "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Acquiescence of a public official requires that the official be aware of the activity constituting torture prior to the activity being carried out and thereafter breach a legal responsibility to prevent that activity. 8 C.F.R. § 208.18(a)(7).

Remand is not warranted regarding Alonzo-Rivera's CAT claim. Both the IJ and the BIA specifically stated Alonzo-Rivera was not entitled to CAT relief, because she had failed to show she would be tortured at the hands of or with the acquiescence of government officials; this explanation provides a sufficient basis for our review. *See Shkambi*, 584 F.3d at 1048. To the extent Alonzo-Rivera

23

seeks review of the merits of her CAT claim, substantial evidence supports the BIA and IJ findings.  Alonzo-Rivera never reported Paredes's abuse to the police; consequently, she could not show Honduran officials were aware of the alleged torture and breached a legal responsibility to prevent it.  8 C.F.R. § 208.18(a)(7).

## D.    Due Process

Finally, Alonzo-Rivera argues the IJ deprived her of her rights to effective assistance of counsel and a fundamentally fair hearing by scheduling the merits hearing only 35 days after she filed her I-589.  Although the IJ did grant a one-week continuance, Alonzo-Rivera asserts she still did not have sufficient time to obtain additional corroborating evidence and seek counsel so she could present clearer, more cohesive testimony.

Aliens in removal proceedings are entitled to due process of law under the Fifth Amendment.  *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007). To establish a due process violation, an alien must show she suffered substantial prejudice from the alleged violation.  *Id.*  An alien may demonstrate substantial prejudice by showing the outcome of the proceeding would have been different absent the alleged violation.  *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 534 (11th Cir. 2013).

Alonzo-Rivera has not demonstrated she was denied due process by the IJ's scheduling of the merits hearing, because she has not shown substantial prejudice

24

resulted from the alleged violation. *Frech*, 491 F.3d at 1281. Alonzo-Rivera does not identify on appeal any additional corroborating evidence she would have obtained and presented if the IJ had granted her request for a longer continuance. Furthermore, although she asserts she would have been able to avoid confusion concerning whether she sought assistance from a domestic-violence organization if she had more time to seek counsel before the merits hearing, that alone is insufficient to show the outcome of the proceeding would have been different. *See Cole*, 712 F.3d at 534. Alonzo-Rivera's testimony concerning the domestic-violence organization was only one of several portions of her testimony the IJ found implausible; it was not the sole basis on which the IJ denied her asylum application. Therefore, the IJ may still have denied her asylum application even if her testimony about the domestic-violence organization had been clear. Consequently, Alonzo-Rivera cannot show the outcome of the proceeding would have been different if the IJ had granted her additional time to seek counsel before the merits hearing. *See Cole*, 712 F.3d at 534.

### III.  CONCLUSION

We grant Alonzo-Rivera's petition in part as to the first two claims on appeal and remand to the agency to consider the entire record in reviewing her asylum application. We deny the petition regarding Alonzo-Rivera's other claims.

**GRANTED IN PART; DENIED IN PART.**